**BALLERINA PEN COMPANY et al.,**
**Appellants,**

v.

**Robert L. KUNZIG et al.**

**No. 22799.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 3, 1969.

Decided April 24, 1970.

Petitions for Rehearing Denied
May 8, 1970.

Mr. Jennings Bailey, Jr., Washington, D. C., for appellants.

Mrs. Patricia S. Baptiste, Atty., Dept. of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., and Alan S. Rosenthal, Atty., Dept. of Justice, were on the brief, for government appellees. Messrs. David G. Bress, U. S. Atty., at the time the record was filed, Joseph M. Hannon, Gil Zimmerman, and Roger E. Zuckerman, Asst. U. S. Attys., also entered appearances for government appellees.

Mr. Duncan H. Cameron, Washington, D. C., for appellee, National Industries for the Blind.

Before BAZELON, Chief Judge, and TAMM and MacKINNON, Circuit Judges.

TAMM, Circuit Judge:

For the past few years the appellants have supplied the federal government with the ball point pens used assiduously by civil servants from the White House to the neighborhood post office. This commodity has traditionally been procured through the system of bidding generally used to obtain supplies for the government. Use of this system is required by the provisions of law governing public contracts, unless another provision authorizes procurement without advertising.[1]

\* \* \* \* \*

(15) otherwise authorized by law \* \* \*.

(41 U.S.C. § 252(c) (Supp. IV 1965–68).)

---

1. The relevant statutory provision states:
   All purchases and contracts for property and services shall be made by advertising \* \* \* except that such purchases and contracts may be negotiated by the agency head without advertising if—

One such other provision of law was established by Congress in 1938 through passage of the Wagner-O'Day Act (41 U.S.C. §§ 46–48 (1964)) which creates a Committee on Purchases of Blind-Made Products (hereinafter "Committee"), the duties of which include selecting commodities suitable for inclusion on a Schedule of Blind-Made Products (hereinafter "schedule"); once included on this schedule, the product is no longer subject to procurement through the traditional bid system.

## I

The statutory framework is essentially as follows: section 46 establishes the Committee, "to be composed of a private citizen conversant with the problems incident to the employment of the blind" and representatives from various government agencies. (41 U.S.C. § 46 (1964).) Section 47 provides that:

It shall be the duty of the Committee to determine the fair market price of all * * * suitable commodities manufactured by the blind and offered for sale to the Federal Government by any non-profit-making agency for the blind organized under the laws of the United States * * *.

(41 U.S.C. § 47 (1964).) The non-profit agency for the blind which has been set up to serve as the liaison between the Committee and the blind workshops is the National Industries for the Blind (hereinafter "NIB").

Section 48 of the Act then provides that:

All brooms and mops and other suitable commodities hereafter procured in accordance with applicable Federal specifications by or for any Federal department or agency *shall be procured from such non-profit-making agencies for the blind in all cases where such articles are available* within the period specified at the price determined by the committee to be the fair

market price for the article or articles so procured * * *.

(41 U.S.C. § 48 (1964); emphasis added.)

The Committee was given authority to promulgate rules and regulations designed to implement the purposes of the Act. (41 U.S.C. § 47 (1964).) The regulations issued under that authority state specifically that it is the duty of the Committee to determine which commodities are suitable for inclusion on the schedule (41 C.F.R. § 51—1.3 (1969)) and to publish the Schedule of Blind-Made Products "listing commodities which must be procured from NIB or workshops." (41 C.F.R. § 51—1.4 (1969).) The regulations further designate NIB as the non-profit agency to assist the Committee in the equitable distribution of orders among the workshops and "delegate" to NIB "the responsibility to assist the Committee to assure that [the] regulations and the intent of the Wagner-O'Day Act are carried out." (41 C.F.R. § 51—1.5 (1969).) The respective functions of the Committee and NIB are stated by the appellee NIB to be as follows:

It is the responsibility of the Committee to determine what commodities are suitable for sale by non-profit making agencies for the blind to the Government, to place the commodities on the Schedule and to determine the "fair market price" at which they will be sold to the Government. NIB then distributes orders received from the Government for items on the Schedule among non-profit workshops for the blind for manufacture.

(Brief for Appellee NIB at 2.)

## II

On April 16, 1968, the General Services Administration (hereinafter GSA) issued a Letter of Commitment to NIB which guaranteed purchases from it of seventy per cent of the estimated annual requirements for ball point pens and refills for the year February 1, 1969 to

January 31, 1970.[2] (App. 110–11.) This "letter contract" was ratified by the Award Contract entered into on November 2, 1968. (App. 113–21.)

Appellants, two closely related corporations and three individual employees of the corporate plaintiffs,[3] filed suit in the district court on December 20, 1968, alleging, *inter alia*, that the action of the Committee in adding ball point pens and refills to the schedule was performed arbitrarily, capriciously, and in violation of law; appellants sought a mandatory injunction in the district court to compel withdrawal of the letter of commitment and to require the issuance of invitations for bids. (App. 6–10.) Defendants below filed motions to dismiss, and on February 27, 1969, the district judge dismissed the complaint without opinion or statement of reasons therefor. (App. 191.)

The government defendants' motion to dismiss urged the following grounds for dismissal:

1. Sovereign immunity.
2. Judicial nonreviewability.
3. Lack of standing to sue.
4. Suit barred as to General Services Administration, an Agency of the United States and not a suable jurisdic [*sic*] entity under any provision of law.

(App. 149.) At oral argument in this case counsel for the government defendants suggested that "[i]t is our position that this case may be readily disposed of on the threshold issue of standing." [4]

### III

The sole question before us today is whether appellants have standing to challenge the actions of the Committee and the General Services Administration, which they contend are illegal for the following reasons:

1. The Committee has erroneously delegated to NIB the responsibility for determining products appropriate for inclusion on the Schedule of Blind-Made Products.
2. The Committee placed ball point pens and refills on the schedule by

---

2. The fact that the contract year has already elapsed does not moot this case because the challenge is to the inclusion of these commodities on the Schedule of Blind-Made Products; as long as they are included thereon, there will be no bids for ball point pens or refills for any contract year.

3. Three individual employees of the corporate plaintiffs intervened in this suit to protect the interests of all employees, most of whom allegedly would be dismissed if the ball point pen contract was not secured by the corporate plaintiffs. (App. 161–62.) The motion to intervene was granted on the same day the suit was dismissed in the district court. (App. 190.) It is noted that the government defendants, in their motion to dismiss, stated as a ground for dismissal that the district court should consider "the strong balance of equities favoring defendants; and the public interest in the welfare of the blind manifested by Congress' enactment of the Wagner-O'Day Act * * *." (App. 149.) Such a "strong balance of equities" is difficult for us to perceive in light of the fact that plaintiff Ballerina Pen Company was awarded a Certificate of Eligibility by the Depart-

ment of Labor (which gives it preferential status in government contracting) due to the fact that its labor force, numbering approximately 200, "is recruited mainly from poor, disadvantaged minority groups, primarily Puerto Ricans and Afro-Americans from riot-prone environments." (App. 38.) We note this fact, not because it gives Ballerina any right to the ball point pen contract, for such is not the case, but rather to point out that emotional reactions have no place in this case. We are as interested as anyone in seeing the laudable purposes of the Wagner-O'Day Act carried out, thus providing the vehicle for achievement and dignity for the blind which should be of concern to all citizens. However, it is imperative that the goals of that Act be achieved in conformity with the law; in assuring that they are, we find no place for emotionalism which pits the interests of the blind against those of hard-core unemployables and seeks to establish an "equitable balance" which favors one over the other.

4. This statement is taken from the tape recording made at oral argument in this case on October 3, 1969.

a mail vote without any knowledge of the facts by the Committee members, but rather solely on the basis of a recommendation from NIB, thus in effect making the action of the Committee a *pro forma* rubber-stamping of the NIB action.

3. The effect of placing these commodities on the schedule was a disastrous dislocation of a private manufacturer and its employees in violation of the intent of Congress in passing the Wagner-O'Day Act.

4. Ball point pens and refills were not "suitable commodities manufactured by the blind" at the time they were placed on the schedule by the Committee. Rather, the action of the Committee and GSA served to set up the blind workshops in the business of producing these commodities.

5. GSA issued its Letter of Commitment prior to the time these commodities were effectively included on the schedule.

6. The commodities involved do not comply with the regulations adopted under the Wagner-O'Day Act because the value of work done by the blind is less than 15% of the total value of the commodity.

(Brief for Appellants at 3–7.)

The criteria for standing were recently articulated by this court in Scanwell Laboratories, Inc. v. Shaffer, 137 U.S. App.D.C. 371, 424 F.2d 859, No. 22,863 (1970) and by the Supreme Court in Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)

and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970). We interpret these decisions as establishing that a party has standing to challenge the government's award of a contract, even in the absence of specific "person aggrieved" language in the statute under which the contract is let, if a three-part test is satisfied. First, the party must allege that the challenged action has caused him injury in fact, in order to satisfy the Article III requirement that he possess "the personal stake and interest that impart the concrete adverseness" necessary to the existence of a case or controversy. Barlow v. Collins, *supra* at 164, 90 S.Ct. at 836; *cf. Data Processing, supra*, 397 U.S. at 150, 90 S.Ct. 827. The plaintiff must further allege that the agency has acted arbitrarily, capriciously, or in excess of its statutory authority, so as to injure an interest that "is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 153, 90 S.Ct. at 830; *cf.* Barlow v. Collins, *supra*, 397 U.S. at 164, 90 S.Ct. at 836. Finally, there must be no "clear and convincing"[5] indication of a legislative intent to withhold judicial review.[6] *See generally Scanwell Laboratories, supra* (137 U.S. App.D.C. at 381, 387, 424 F.2d at 869, 875 n. 10, 19).

It appears that the drafters of section 10 of the Administrative Procedure Act[7] deemed it necessary to grant such standing because a rather critical gap existed in the remedies available to one aggrieved by agency action. Logic tells us that Congress lays down the statutory framework within which the various agencies

---

5. H.R.Rep.No.1980, 79th Cong., 2d Sess. 41 (1946).

6. This criterion is sometimes regarded as involving the question of "reviewability" rather than "standing," *see* Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), but the two concepts are not always sharply distinguished, *cf.* Association of Data Processing Serv. Organizations v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

7. Section 10 of the Administrative Procedure Act provides:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

5 U.S.C. § 702 (Supp. IV 1965–68).

it establishes are to operate with very definite goals in mind—the agencies are designed to function according to the will of Congress; they are not given life, breadth and scope of their own to function as they see fit; rather, they must function as Congress intended them to function. An analysis of the range of that Congressional intent is sometimes a difficult task, and the murky depths of the legal labyrinths existing because of these uncertainties are often difficult to penetrate. The premises upon which agency action is predicated are too often evanescent and, in an era when, as the "fourth branch of government," the administrative agencies may well have a more far-reaching effect on the daily lives of all citizens than do the combined actions of the executive, legislative and judicial branches, the necessity for a legal means of piercing the glittering carapace of agency determinations to insure that they do not conceal congressionally unauthorized action is obvious.

Frequently the motivation of challenged agency action is neither caitiff nor paltry, with the result that the purity of doctrine and the nobility of purpose tend to narcotize completely the searches for legal authorization. The unfortunate result is euphemistic in that the legal wolf is effectively disguised in an emotionally appealing wool. Courts are therefore confronted with the problem of insuring that the idealistic objectives of brave but congressionally unauthorized action, ostensibly undertaken pursuant to a "public interest" provision, are legally bottomed upon something more

than a Bourbon Monarch's "L'Etat—c'est Moi."

In the image, then, of Cervantes' Knight of the Woeful Countenance, the courts must require that creating, enabling and empowering legislation is not desecrated beyond all possible recognition in the name of the public welfare and interest. It is at this point that an impartial court is required to ascertain the degree of delegation of authority the Congress intended and to determine whether the agency in question has exceeded the bounds of its delegated authority. *Cf.* Leedom v. Kyne, 358 U.S. 184, 188, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958); SEC v. Chenery Corp., 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).[8]

While logic tells us that such review is necessary, experience must tell us who may serve as the catalyst to initiate judicial review. The interest being protected is basically the public interest, for the public is to be protected from excesses which hurdle the barrier set up by the creating statute and which allow decision making, not on the basis of Congressional guidelines, but instead on the basis of personal insight, prejudice, predilection, or perhaps even visceral reaction.[9] Experience teaches us, however, that while the interest protected may be that of the public, the person who brings the action to seek review of the challenged agency activity will almost invariably be one who has been directly or indirectly injured by that action. As we noted in *Scanwell Laboratories:*

[T]he essential thrust of appellant's claim on the merits is to satisfy the

---

8. The need for judicial review of agency action to maintain the integrity of the statutory framework was expressed in *Scanwell Laboratories* in this way:

When the Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests, while at the same time furthering the public interest. (137 U.S.App.D.C. at 376, 424 F.2d at 864.)

9. We do not mean to imply any bad faith on the part of governmental officials who are called upon by the very nature of things to make numerous daily judgments concerning the conduct of the affairs of the executive branch. That discretion must be exercised to fill in the many voids in the rubric of statutory authority is unquestionable. Such discretion, however, may not be abused to the extent of arbitrarily rearranging the statutory scheme, however sincere the intent of the agency in making such a rearrangement.

public interest in having agencies follow the regulations which control government contracting. The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated by a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."
(at 376, at 864 of 424 F.2d; *see also* Associated Industries of New York State, Inc. v. Ickes, 134 F.2d 694, 704 (2d Cir.), vacated as moot, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943).)

When such a suit is brought it is of course necessary that there exist adequate safeguards to insure that there will be no incursion of frivolous lawsuits which will flood the courts with unnecessary litigation. We think that such safeguards are provided by the criteria established in *Scanwell Laboratories*.[10]

## IV

Taking the appellants' allegations as true, we find that the criteria are met in the case at bar and that appellants have standing to bring the action in the district court. The process of determining whether standing exists is one which the district judge must undertake in the first instance. In order to aid his determination he will have all of the traditional devices at his disposal, including pretrial memoranda, affidavits, and conferences at which he will be able to adduce enough information to determine whether he has before him parties and a controversy which meet the criteria set forth in *Scanwell Laboratories, Data Processing,* and *Barlow.*

The allegations in the current case, if proved, will reveal significant deviations from the statutory framework originally set forth by the Wagner-O'Day Act for the benefit of the blind. The first allegation, for example, indicates a delegation of authority from the Committee to NIB which is without sanction in the implementing legislation. The Act states that the Committee may authorize a "central non-profit-making agency to facilitate the distribution of orders among the agencies for the blind, and other relevant *matters of procedure* as shall be necessary to carry out the purposes of this [Act]." (41 U.S.C. § 47 (1964); emphasis added.) The regulations promulgated under the Act state the responsibilities of NIB to be:

> [T]he agency [will] facilitate the equitable distribution of Government orders among the workshops and [NIB] is delegated the responsibility to assist the Committee to assure that these regulations and the intent of the Wagner-O'Day Act are carried out.

(41 C.F.R. § 51—1.5 (1969).) Under these provisions NIB is given no responsibility whatsoever to determine commodities suitable for inclusion on the Schedule of Blind-Made Products.[11] This

---

10. The *Scanwell Laboratories* opinion set forth these criteria as follows:

> [T]he grant of standing must be carefully controlled by the exercise of judicial discretion in order that completely frivolous lawsuits will be averted. There must be a practical separation of the meritorious sheep from the capricious goats—a recognition that *cucullus non facit monachum.* However, responsible federal judges will be able to discern a case in which there is injury in fact, a sufficient adversary interest to constitute a case or controversy under Article III, and an otherwise reviewable subject matter to prevent the dockets from becoming overcrowded. (at 384, at 872 of 424 F.2d.)

11. The responsibilities delegated to NIB include only such procedural and implementational matters as the issuance of allocations and clearances, inspection of the workshops, maintenance of records on the workshops, submission of annual reports to the Committee, and entering contracts with the Government to supply it with commodities made in the workshops. 41 C.F.R. § 51–1.5(b) (1969). Even these rather limited provisions for NIB responsibility were changed in new regulations adopted by the Committee specifically for the ball point pen project, as the following excerpt from Committee minutes reveals:

> [A]s talks between GSA and NIB progressed, it became apparent that if

function is clearly restricted to the Committee by 41 U.S.C. § 47 (1964) and 41 C.F.R. § 51—1.3 (1969), yet in the current case appellants have alleged—and submitted documents which tend to prove—that the Committee added ball point pens and refills to the schedule in a manner clearly inconsistent with the statutory framework. We have set forth in the margin Exhibit "C" which was introduced in the district court and which reveals the manner in which these commodities were placed on the schedule.[12]

Whether this delegation of authority exceeds the statutory powers of the Committee must await determination in the district court on remand. This allegation, however, along with others advanced by the appellants, clearly constitutes the kind of prima facie showing

GSA were to issue orders to different Shops, there would be considerable complications or extra effort involved that could be avoided if the contract were issued directly to NIB. * * * GSA and NIB came to an agreement on this approach, and the request was made to the Committee that the Regulations be amended.

\*    \*    \*    \*    \*

General Hedlund asked if this action might establish a precedent. Mr. Abersfeller stated that it could, citing as an example that the assembly of tool kits might better be handled in this manner. However, in numerous instances when no useful purpose would be served, neither NIB nor GSA would want to do it this way.

Mr. Sellman indicated that the Committee would still have full power under the Act to control individual situations.

Mr. Goodpasture stated that this gives NIB responsibility for contracts which is something they never had before. They would prefer not to be in that position if at all possible.

The motion was made by Colonel Shaunesey and seconded by General Riemondy that the Regulations as proposed be adopted. The vote was unanimous.

Excerpt of Portions of Minutes of Meeting of the Committee on Purchases of Blind-Made Products relating to Ball Point Pens and Refills, held May 8, 1968. (App. 77–78.)

12. In a letter to Representative John J. Rooney under date of September 12, 1968, L. F. Donahue, Executive Secretary of the Committee on Purchases of Blind-Made Products, stated the procedure for including articles on the schedule to be:

The normal procedure of the Committee in considering a new item for the Schedule of Blind-Made Products is for National Industries for the Blind to make such feasibility, engineering, economic, or other studies as are necessary to reach a decision regarding the item. Such studies have to do mainly with the capability of workshops for the blind to make the item and the economics involved in supplying the Goverment with the item at a "fair-market price," as required by the Wagner-O'Day Act.

*As a result of such studies, NIB recommends the adoption of items when appropriate and proposes a price. The latter is analyzed by the Defense Supply Agency as a price consultant to the Committee. If the price is found to be within the criteria established by the "Act," the Executive Secretary polls the membership regarding the adoption of the proposed item at the proposed price. Consequently, there is usually no Committee action regarding the adoption of the new item and, therefore, no record in the minutes of a Committee meeting. This is true in the case of ball point pens.*

The Committee action is represented by the mail poll of the members. A copy of the document by which this action was taken is enclosed. The vote of the Committee was unanimous in favor of the action.

(App. 32–33; emphasis added.) The "action" of the Committee members consists of signing an authorization letter; the entire text of the letter regarding the inclusion of ball point pens and refills on the schedule reads as follows (App. 184):

Feb. 29, 1968

National Industries for the Blind has proposed that BALL POINT PENS and REFILLS be added to the *Schedule of Blind-Made Products* at the following prices:

\*    \*    \*    \*    \*

In coordination with the General Services Administration, the proposed prices have been reviewed by the Directorate, Procurement and Production, Defense Supply Agency, and determined to represent fair-market prices.

Your approval is requested.

Sincerely,
L. F. Donahue
*Executive Secretary*

called for by the criteria established by this court in *Scanwell Laboratories*.

The other allegations of illegality are set forth at 374–375, at 862–863 of 424 F.2d, *supra*. Any one of these alleged actions, if proved, would establish the requisite prima facie showing. For example, 41 C.F.R. § 51—1.1(b) (1969) provides that a workshop, in order to qualify for production of commodities to be furnished the government, must be one:

> [O]perated in the interest of the blind, the net income of which does not inure in whole or in part to the benefit of any shareholder or individual and which employs blind persons to an extent constituting *not less than 75 percent of the total hours of employment during the fiscal year*, of all personnel engaged in the direct labor of manufacturing, assembling, or handling of all commodities by the [workshop] * * * whether for this program or otherwise.

(Emphasis added.) A serious question is raised concerning the Committee's interpretation of that regulation. Rear Admiral Bieri, Chairman of the Committee, in an affidavit filed in this case submitted the explanation that:

> [I]t has been the consistent and long standing interpretation of the Committee that the provision in the Committee Regulations * * * requiring 75% blind employment on direct labor on "all commodities" means that blind persons must perform 75% of the workshops' total direct labor on the totality of *all* products produced by the workshops; it does not mean, and was not intended to mean, that blind persons must perform 75% of the direct labor on each and every particular product produced by the workshops.

(App. 159.) It is alleged here that a very small percentage of the actual direct labor on ball point pens and refills is done by blind labor. (App. 8.) That this is true is admitted by counsel for appellee National Industries for the Blind, who stated at oral argument:

> I would like to very briefly address myself to a second question and that is the amount of blind labor involved in the manufacture of these pens and refills. It's been argued that only 14% of the total contract price represents blind wages. I'd like to point out that neither the Wagner-O'Day Act nor the regulations specify exactly what percentage of the contract must represent blind labor. In fact, on a number of our items, which are presently on the schedule and being acquired by the government, the amount of blind labor is less than the 14% and has been for some time. So there are no guidelines in the statute or the regulations.[13]

Whether this lack of guidelines in the statute and regulations leaves the Committee with the authority to add products to the schedule when a large percentage of the work on them will be done by workers who are not covered by the letter and spirit of the Wagner-O'Day Act must be determined in the first instance in the district court. Suffice it to say that the allegation of such activity, combined with its admission by Committee officials and counsel, further supports appellants' showing of a prima facie case sufficiently strong to remove the bar to suit imposed by the standing doctrine.

One final allegation which deserves attention is the argument made by appellants that inclusion of ball point pens and refills on the schedule to the detriment of a private manufacturer is in violation of the spirit of the Wagner-O'Day Act as evidenced by the legislative history thereof. In their complaint the corporate plaintiffs asserted that the effect of losing the ball point pen contract would be a forced closing of their plant and the discharge of many of their employees. Appellants concede that the Wagner-O'Day Act does not confer specific rights on them and that it was not enacted for their benefit. (Reply Brief

---

13. This statement is taken from the tape recording made at oral argument in this case on October 3, 1969.

for Appellants at 8.) They do submit, however, that the legislative history of that Act clearly shows a concern for and desire to protect private industries which might be disadvantaged by the inclusion of certain products on the schedule. This concern was evidenced in the June 13, 1938 floor debate on the bill, which is printed in the Congressional Record, Vol. 83, Part 8, at pages 9110–16, pertinent parts of which reveal the following:

Mr. LANZETTA. * * * Under present conditions organizations for the blind are ruinously competing against each other in an effort to get Government work. The competition has become so keen that the prices at which this work is now being let are so low as to be practically ruinous.

We have been assured that under this bill the committee which it creates will first establish what the fair prices for these articles are; and, second, it will distribute the orders among the various agencies for the blind. In other words, instead of the present cutthroat competition the blind people who are engaged in this type of work will be able to obtain it at a fair price. (p. 9111.)

* * * * * *

Mr. MARTIN of Massachusetts. They do not make any other article except mops and brooms?

Mr. LANZETTA. That is all. (p. 9111.)

* * * * * *

Mr. MICHENER. We have another resolution coming up here to investigate monopolies, trusts, and things of that kind. [This bill] sets up a monopoly or trust and provides that the Government must pay a given price * * * regardless of what the articles may be brought for on the open market in competition with ordinary labor.

Mr. LANZETTA. May I explain to the gentleman that, because of the situation as it now exists, the brooms and mops now being manufactured for the Federal Government are now all being made practically by blind organizations. The reason for this condition is that private industry cannot compete with the blind organizations insofar as Government purchases of these products are concerned. I understand that the manufacturers of mops and brooms are not interested in this bill, nor do they feel that this bill will affect them in any way. (p. 9111.)

* * * * * *

Mr. LANZETTA. * * * The gentleman must understand that blind people cannot engage in every type of work. Their field is very limited. This making of brooms and mops is one of the few things that most blind people can do and that is the reason why private industry has practically stepped out of this field. (p. 9111.)

* * * * * *

[Mr. LANZETTA.] This bill will eliminate the present ruinous competition because under this bill the committee will have the power to establish a fair market price for these articles. * * * *If private industry was in competition with these blind organizations, I might agree with the gentleman that there would be some cause for complaint*; but I have been given to understand that private industry is not in competition with these organizations insofar as these articles are concerned. (p. 9112; emphasis added.)

* * * * * *

[Mr. McGRANERY.] *The Members of this House have no need to fear blind-made goods entering into competition with private industry.* (p. 9112; emphasis added.)

* * * * * *

[Mr. LANZETTA.] *Many of the Members of this House may be worried about whether this bill will give a monopoly to the blind people to the detriment of private industry.* I might explain to Members of the House that private industry does not compete in this field. They realize that this is a field exclusively engaged in by blind people, and, consequently,

*whatever we do under this bill today will not in any way injure private industry.* (p. 9113; emphasis added.)

\* \* \* \* \* \*

Mr. CRAWFORD. Do I understand that in the broom and mop industry mechanical devices are not used in bringing together the elements that go to make up a broom or a mop?

Mr. LANZETTA. So far as the blind are concerned, it is mostly hand work.

Mr. CRAWFORD. I know it is by personal experience, but you are bringing into operation here a prize-fixing [*sic*] scheme, which is governed by humanitarian motives, to the end that the efforts of blind people and their products shall bring a living wage. Suppose when that price is fixed, it goes above [the open market price]. Then will the Government buy blind-made products at a higher price than that bid by private industry?

Mr. LANZETTA. Private industry cannot compete now with these blind-made products. If some machinery should come on the market tomorrow, that would make it possible for private industry to manufacture brooms and mops more cheaply than the blind, *then some change would have to be made.* (p. 9114; emphasis added.)

\* \* \* \* \* \*

Mr. DUNN. *I may say to the gentleman that if I were convinced that this bill would hurt any factory that was really protesting against the bill I would be against it.* \* \* \* (p. 9114; emphasis added.)

\* \* \* \* \* \*

Mr. DUNN. \* \* \* *If a blind representative offered brooms and mops to the Government in such a way that the products of the blind were undermining the products of private business I would be opposed to this bill, but the enactment of this bill will not do that.* (p. 9115; emphasis added.)

These excerpts from the debate on this bill immediately prior to its passage show rather dramatically that the intent of Congress in establishing the Committee was to alleviate the competition among the various blind workshops and that the bill was not designed to put them into competition with private manufacturers. While appellees contend that the floor debate on the bill is much less relevant to the inquiry into legislative intent than the committee reports, which in this case do not mention the problems of competition with private industry raised on the floor, we need merely note that *all* of the legislative history is relevant to a reviewing court's determination of the scope and purpose of legislation under consideration; this includes perforce the debate on the bill as well as the official committee comments.[14]

This additional allegation of illegality through Committee action inconsistent with the purposes of the Wagner-O'Day Act is pointed out not only as further substantiation of the prima facie showing made by appellants but also to indicate an important area for consideration by the district court in its review of the case on remand. From its inception with

---

14. Although this has always been the case, counsel for appellee NIB would have us give considerably more weight to the reports than to the floor debate in view of this court's statement in Curran v. Clifford, No. 21,040 (D.C.Cir. Dec. 27, 1968), that "Committee Reports are considerably more authoritative than words spoken on the floor of the Congress." (Slip op. at 9.) Not only is that statement not binding on us because the opinion was vacated on April 3, 1969, well in advance of the filing of the briefs in this case, but it is also inapposite because it related to conflicts between statements made in the reports and on the floor. In the current case the reports were silent on the point of injury to private industry and we have only the floor debate to illuminate the intent of Congress. In any case, statements by the sponsor or floor manager of a bill should be given weight; this method of determining the Congressional intent has received frequent sanction from the Supreme Court. *See, e. g.,* Allen v. State Board of Elections, 393 U.S. 544, 564–571, 89 S.Ct. 817, 22 L.Ed. 2d 1 (1969).

the inclusion of brooms and mops, the Schedule of Blind-Made Products has grown to include a number of products, and indications are that the Committee and NIB contemplate adding more items as they are identified. That the action here was taken without complete knowledge on the part of the government agencies involved is indicated by the following statement in a letter dated December 9, 1968, from Rudolph Oswald, Economist in the Department of Research, to Rear Admiral Bieri, Chairman of the Committee:

> [A] serious problem may arise as the product line for blind-made goods is expanded. This problem is the displacement of the existing work-force as products previously in the private sector are assigned to the exclusive domain of the blind. In this regard, I urge that the committee in reviewing the feasibility of expanding the present product line, give due regard to the impact on the private economy—particularly the problem of worker displacement.

> \* \* \* \* \* \*

> The problem was highlighted for us in the situation related to ball-point pens. In this case, an existing supplier, Ballerina Pen Company was displaced as a government supplier through the transfer of this product line to the list of blind-made products. About 200 [employees] have been threatened by lay-off because of the loss of the government contract to the exclusive production of this product by the blind. This particular situation sorely grieves us, and we ask that you consider what action the Committee on Blind-Made Products might take to help alleviate this displacement threat to these workers.

(App. 175–176.)

Counsel for the appellees makes much of the fact that, even if there was some question of impropriety in the manner in which these commodities were originally placed on the schedule, any defect was cured by the action of the Committee on

December 17, 1968, at which time this action was ratified by the Committee members. There is often a wide gulf between the facts as they are stated by interested parties and the facts as they really exist. Thus the statement that the previous Committee action was ratified at the December meeting is true in form, but not in substance, as the following statements from the minutes of that meeting will clearly show:

> [The Chairman] was not able to recall that the question of the refills and whether these were considered manufactured items had been discussed specifically, but the Committee did approve this item and agreed to add it to the Schedule. (App. 181.)

> \* \* \* \* \* \*

> Mr. BALDAUF mentioned that Mr. Arndt says that the action being taken will result in closing of a plant employing 180 to 240 disadvantaged employees. He asked if this is actually going to result in the closing of a plant.

> Mr. Abersfeller answered that if it does, it will be because Ballerina chooses not to meet the competition in the market. He stated further that while this is an emotional appeal, Congress has not yet been able to legislate any preference for hardcore unemployed areas. The only source lies in Defense Manpower Policy No. 4. It has no legislative history or background. On the other hand, this company has done a yeoman's job of employing disadvantaged people. (App. 184.)

> \* \* \* \* \* \*

> *Mr. Baldauf stated that had the Committee acted in terms of "knowing that our action would put a firm out of business" and with full knowledge that this would be the result, some would have studied this further. \* \* \* In [the] future we would have to study further actions of this Committee which would result in putting [firms] out of business. \* \* \* He agreed that this was not a consideration when the Committee first studied*

the ball point pen action. \* \* \*
(App. 184–85; emphasis added.)

\*　\*　\*　\*　\*　\*

[Mr. Abersfeller] stated that he felt one of the sensitive issues is not the ball point pen itself—but do we have a serious question about the refills. *Perhaps the Committee might say that there is some doubt in that particular case but since the contract has been let, we do not plan to change.* Or should we say that this was improper, NIB does not propose to manufacture these and we will turn that part around.

*General Hedlund stated that the Committee should stick with its decision, though there may be qualms about the refills. Once NIB is making the refills, there should be no question about it.* He felt Mr. Abersfeller's suggestion is a good one. *Recognizing that there may be some question as to whether the decision was right in the first place, because of commitments and equipment investments the Government has an obligation to go through with this.* (App. 185; emphasis added.)

\*　\*　\*　\*　\*　\*

The Chairman stated that *for the record we can vote on a motion that the Committee sustains the position that we took previously* that the pens and refills are manufactured items that properly come within the cognizance of the Act \* \* \* and that we consider the refills as a part of the proposed production process, and *have reviewed all of the previous discussion and all of the material sub-*

mitted to us. We still stand by our position. (App. 188; emphasis added.)

This recitation from the minutes of the Committee meeting indicates very clearly that there were grave doubts of some members of the Committee as to whether ball point pens and refills had been properly placed on the schedule, but due to the fact that the contract was already let and expenditures were taking place thereunder, they were reluctant to admit error in the earlier decision. Although at this point in the proceedings the Committee decided to pass a resolution which attempted to rectify the errors it had previously made in passing upon proposed commodities for inclusion on the schedule,[15] such action could in no way correct the error which Ballerina alleges was made in the ball point pen determination. The extent of the illegality involved and the proper method to be used to repair the damage that was done will have to await determination in the district court. Our purpose here is merely to document further the overwhelming nature of the prima facie case shown by appellants in the allegations they made in the district court when they brought this action. To say that such conduct on the part of government agencies must go without review or remedy is clearly contrary to the fundamental precepts of our legal system.

## V

In addition to requiring a prima facie showing of arbitrary or capricious agency action, or action not sanctioned by or which is beyond the scope of the agency's statutory authority,[16] *Scan-*

---

15. The resolution adopted by the Committee at the December 17, 1968, meeting states (App. 189):
    In the future NIB [shall] be responsible for providing the Committee with a summary document dealing with the items to be considered for inclusion in the Schedule of Blind-Made Products, with a full justification for inclusion of the item in the Schedule. It should be a clear record necessitating an approval or disapproval by each Committee member.

16. The Administrative Procedure Act provides for voiding such agency action. Sections 2(A) and (C) of 5 U.S.C. § 706 (Supp. IV 1965–68) provide in pertinent part:
    The reviewing court shall—
    \*　\*　\*　\*　\*
    (2) hold unlawful and set aside agency action, findings, and conclusions found to be—

*well Laboratories* also demands that the plaintiff demonstrate aggrievement in fact as a result of the agency action which will call into play the provisions of section 10 of the Administrative Procedure Act. (137 U.S.App.D.C. at 377–378, 424 F.2d at 865–866.) While there are undoubtedly myriad factors to be taken into consideration in determining whether aggrievement in fact has been shown in a given case, we think it unnecessary to go into any detail in finding that this criterion is met by appellant in this case because aggrievement in fact is conceded by the appellees. Appellants alleged in the motion for a preliminary injunction in the district court that they would suffer irreparable injury if not allowed to bid on the ball point pen contract. (App. 83.) At oral argument counsel for the government appellees stated:

> We feel that there are basically two elements that go into the question of whether a litigant has standing. The first is the Constitutional requirement that there be an adversary interest, that there be enough of a concrete personal stake in the outcome of the case to insure [the necessary adverseness]. *We don't argue here that that's not the case. We agree that there is some aggrievement on the part of Ballerina—exactly how much we don't feel it's necessary to determine.* But going from that point, the second requirement * * * is that the challenged actions of the government invade a legally protected right of the litigant.[17]

That the government has conceded aggrievement in fact is further confirmed by the brief for the government defendants, in which it is stated:

> In these circumstances, the plaintiffs can claim only that they are aggrieved in fact by the award of the contract to NIB. * * *
>
> *       *       *       *       *       *
>
> The plaintiffs assert, as the only basis for their standing to maintain this action, that they are aggrieved in fact by the Government's award of the contract to NIB. * * * For purposes of this case, *we can assume that the plaintiffs' loss of prospective business and the consequent economic impact upon them gives them a concrete personal stake in the outcome of the case and therefore it satisfies the constitutional requisite of standing.* But this adversary interest, although necessary, is not sufficient.

(Brief for Appellees Administrator of the General Services Administration and Members of the Committee on Purchases of Blind-Made Products at 12–14; emphasis added.)

## VI

Our opinion in *Scanwell Laboratories* rejected the legal right doctrine and held that standing exists for one aggrieved in fact by agency action, if the other criteria for suit are met.[18] One of these additional factors was a finding that judicial review is not precluded under the terms of the statute in question.

We find nothing in the Wagner-O'Day Act to indicate any intent on the part of Congress that judicial review should not exist as to the procedures used by the Committee in adding commodities to the schedule. We therefore hold that such procedures are reviewable under

---

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
*       *       *       *       *
(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right * * *.

17. This portion of the government appellees' argument is taken from the tape recording made at oral argument in this case on October 3, 1969.

18. We stated in our opinion in *Scanwell Laboratories, supra:*
> [I]n spite of the fact that the Supreme Court has not yet chosen to hold that the Administrative Procedure Act applies to all situations in which a party who is in fact aggrieved seeks review, regardless of a lack of legal right or specific statutory language, it is clearly the intent of that Act that this should be the case. (at 384, at 872 of 424 F.2d.)

the Administrative Procedure Act and that the appellants in this case have standing to initiate that review.

Reversed and remanded.