AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, LOCAL 1668, and Mildred Crank, William Slater, Tyrone E. Davis, and Ola Mae Mitchell, for themselves individually and on behalf of all other civil service employees of the United States Air Force at Elmendorf Air Force Base and other Air Force stations in Alaska who are similarly situated, Plaintiffs-Appellants,

v.

James B. DUNN, Commander, Elmendorf Air Force Base (Colonel, USAF), James Hill, Commander, Alaska Air Command (Lieutenant General, USAF), John C. Stetson, Secretary of the Air Force, and Ray Marshall, Secretary of Labor, Defendants-Appellees.

No. 75–3804.

United States Court of Appeals, Ninth Circuit.

Sept. 28, 1977.

Robert M. Goldberg, Anchorage, Alaska, argued, for plaintiffs-appellants.

William Kanter, App. Section, Civ. Div., Dept. of Justice, Washington, D. C., argued, for defendants-appellees.

Before WRIGHT, CHOY and ANDERSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Appellants, former civilian employees of the Air Force, and their labor union, brought suit seeking declaratory and injunctive relief in an effort to require the United States Air Force to set aside certain contractual agreements and to reinstate appellants to their former jobs. The district court dismissed the action and this appeal followed. We affirm.

Appellants were all federal civil service employees classified as mess attendants, who performed custodial kitchen work at the Air Force mess halls located in Alaska. Pursuant to the Office of Management and Budget's Revised Circular A-76, the Air Force, in September, 1974, undertook a study to determine whether it should continue in-house food service operations at its various bases. By letter the Air Force notified all major commands, including the Alaskan Air Command, that cost comparison studies should be developed to determine the relative cost of retaining civil service mess attendants as opposed to employing an outside contractor to provide the food service attendants.

Invitations for bids were sent out for the food service attendant function for Elmendorf Air Force Base, Alaska, Eilson Air Force Base, Alaska, and various remote sites in Alaska. Southeastern Services, Inc. was the lowest responsive bidder. The Air Force then compared Southeastern's bid with the cost of retaining civil service employees and found that Southeastern's bid was less than the cost of retaining the civil service employees and, accordingly, awarded a contract to Southeastern. Appellants then filed this action.

Appellants attack the Air Force's actions from four fronts. Initially, appellants contend that the determination of the minimum wage that could be paid to the food service employees under a private contract, made by the Secretary of Labor under the Service Contract Act, 41 U.S.C. § 351, *et seq.*, was erroneous. Secondly, appellants contend that the reduction in force violated the Veterans Preference Act, 5 U.S.C. § 1302, *et. seq.*, in that preference eligible civil service employees were replaced by

private sector employees. Appellants' third contention is that the contracts with Southeastern are personal service contracts violative of the "Pellerzi standards" in that civil service personnel will be directly supervising the contractor's employees. Lastly, appellants contend that the cost comparison studies undertaken by the Air Force were erroneous. As stated earlier, the district court, for various reasons which will be discussed hereinafter, did not accept appellants' contentions and dismissed the action.

## MINIMUM WAGE DETERMINATION

■ The district court held that appellants lacked standing to contest the wage rate determination of the Secretary of Labor. The court applied the standing test set forth in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), which requires that a plaintiff must establish an "injury in fact"[1] and also that he must show that he falls "arguably within the zone of interests to be protected or regulated" by the statute upon which he relies. In the present case, the district court found that appellants had established an injury in fact, but denied standing because appellants were not within the zone of interests to be protected by the Service Contract Act, 41 U.S.C. § 351, *et seq.*

A basic understanding of the Service Contract Act is essential to our disposition of this case. Basically, the Service Contract Act provides that every contract in excess of $2,500.00 must contain a provision specifying the minimum wage to be paid contract employees. This minimum wage rate is determined by the Secretary of Labor after analyzing the prevailing wage rates in the locality paid to comparable employees. Bids are then invited and the private contractor utilizing the minimum wage rate submits his bid. The bid is then compared with the cost of retaining civil service employees to determine the most economical

alternative. The Act also provides sanctions in the event any of the contractor's employees are underpaid.

The legislative history reveals that the Service Contract Act was passed in reaction to Congress' finding that a depressed wage level prevailed in private service employment. These service employees were not covered, in many instances, by the Fair Labor Standards Act or by state minimum wage rates, resulting in a situation where contractors paying the lowest wage would secure most government jobs. Congress, feeling that in this way "the Government is in effect subsidizing subminimum wages" (1965 U.S.Code Cong. & Admin.News, p. 3739), passed the Service Contract Act to insure "that the Federal Government shall not be a party to the depressing of labor standards in any area of the nation." (111 Cong.Rec. 24387, 1965, Cong. O'Hara, co-author of the Act.) The purpose statement of the Service Contract Act states:

> "The purpose of this bill is to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal · agencies."
>
> 1965 U.S.Code Cong. & Admin.News, p. 3737.

Although clearly not the primary beneficiary of the Act, the question remains whether the terminated federal service employees are within the zone of interests to be protected.

In support of their position that they have standing, appellants cite *Lodge 1858, American Federation of Gov. Emp. v. Paine,* 141 U.S.App.D.C. 152, 436 F.2d 882 (1970). In *Lodge 1858,* six civil service employees and their union sued the Administrator of the National Aeronautical and Space Administration (NASA), contending that NASA had violated congressional enactments in procuring, through its service support contracts, outside manpower to perform tasks assigned by law to civil service

---

1. For an application of "injury in fact" see *Bowker v. Morton,* 541 F.2d 1347 (9th Cir. 1976) and *United States v. Imperial Irrigation Dist.,* 559 F.2d 509 (9th Cir., decided Aug. 18, 1977).

employees only. The Court of Appeals found that the employees had standing to contest NASA's employment of contractor employees. However, this holding must be limited to its facts because it is clear that the court focused on the NASA legislation in order to bring the employees within the zone of interests test. That legislation required all NASA positions to be filled in accordance with the civil services laws except for 425 scientific, engineering or administrative personnel. 42 U.S.C. § 2473(b)(2) (1970). In the present case there is no similar statute or regulation that requires that the food service function be performed by civil service employees.

Appellants also rely upon *Descomp, Inc. v. Sampson*, 377 F.Supp. 254 (D.Del.1974) and *Merriam v. Kunzig*, 476 F.2d 1233 (3rd Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), cases in which disappointed bidders were found to have standing to contest the wage rate determination under the Service Contract Act *(Descomp, supra)* and the leasing authority of the General Services Administration under their procurement statute, 41 U.S.C. § 253 *(Merriam, supra)*. However, these cases are also inapposite because a disappointed bidder stands in a position quite different from that asserted by appellants. By virtue of the various bidding and procurement statutes, the government invites bidders to respond and, accordingly, not only is the government's interest protected, but also the interests of those who respond to the government's invitation. Thus, bidders who are found to have standing attain their interest by virtue of their relationship to the government. This relationship was fully described by the court in *Merriam, supra:*

> "When the Government solicits proposals to which bidders in good faith take the trouble to respond, the actual relationship between solicitor and bidder is not the same as before. The bidder has placed in the hands of the representatives of the Government the power to bind him to a contract. It is not too much to find a correlative obligation of fair dealing within the terms of the solicitation; an obligation sufficient to confer standing to enforce that obligation."

476 F.2d at 1242, n. 7.

Appellants have failed to convince us that their interests are within the zone of interests to be protected by the Service Contract Act. That Act was passed for the benefit and protection of employees of contractors and subcontractors performing services for the government.

■ Nor are appellants aided by resort to recent Supreme Court pronouncements that allow, in certain circumstances, a plaintiff to assert the rights of third parties. *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) and *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The rights sought to be asserted here are those of the private employees whose interests, as found by the district court, are antithetical to the federal employees. The terminated federal employees present an "either-or" situation in relation to the private employees. If the wage rate is determined to be erroneous, then appellants will retain their jobs at the expense of the private employees. We do not believe that the Supreme Court intended to allow the assertion of third party interests to enable a plaintiff to defeat those third party interests.

Accordingly, we hold that appellants do not have standing to contest the determination of the minimum wage rate to be paid to the contractor's employees.

*VETERANS PREFERENCE ACT*, 5 U.S.C. § 3309, *et seq.*

■ Appellants next contend that since some of its members are veterans who were replaced by private service employees, these veterans cannot be fired pursuant to the Service Contract Act. The district court denied this claim on the merits, finding that no cases supported appellants' construction of the Veterans Preference Act and that such construction "would produce ludicrous and costly results."

Under 5 U.S.C. § 3502(b), "A preference eligible employee whose efficiency or per-

formance rating is 'good' or 'satisfactory' . . . is entitled to be retained in preference to other competing employees." However, these veterans are only entitled to preference over employees within groups defined as competing. *Brannan v. Elder*, 341 U.S. 277, 71 S.Ct. 685, 95 L.Ed. 939 (1951). Thus, in this case there were two distinct "competing groups"—the federal employees and the private service employees. Appellants, as veterans, only have preference over those employees within their group, the federal employees, and not over the private sector group. We also reject appellants' construction of the Veterans Preference Act.

## PELLERZI STANDARDS

The Pellerzi standards, so named because they were originally set forth in a letter written by L. M. Pellerzi, the former General Counsel of the Civil Service Commission, attempt to define the proper working relationship between federal employees and the employees of a private contractor. These standards are intended to prevent "the procuring of services by contract in such a manner that the contractor or his employees are in effect employees of the government." 32 C.F.R. 22.102–1. The district court held that by failing to exhaust their administrative remedies, specifically by fail-

ure to resort to the Civil Service Commission's Intra-Executive Department Procedures, appellants were precluded from obtaining judicial review of their contention that the Pellerzi standards had been violated.

█ The basic purpose of the exhaustion doctrine, as stated by the Supreme Court in *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972), "is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." Resort to administrative remedies is not required where the administrative remedy is inadequate, *NLRB v. Industrial Union of Marine and Shipbuilding Workers of America*, 391 U.S. 418, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968) or where proceeding within the administrative process would be futile or serve no purpose. *Pence v. Kleppe*, 529 F.2d 135 (9th Cir. 1975). Additionally, the application of the exhaustion doctrine is within the sound discretion of the courts. *Kale v. United States*, 489 F.2d 449 (9th Cir.), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2617, 41 L.Ed.2d 220 (1973).

█ In the present case, pursuant to the Intra-Executive Department Procedures quoted in the margin,[2] the Civil Service

---

**2.** The Intra-Executive Department Procedure has never been published in the Code of Federal Regulations. However, in its brief to the district court (C.R. 110–112) the government has set forth the pertinent provisions. Both parties refer to the Intra-Executive Department Procedure and quote from its language and there is no dispute as to its existence, content or applicability. Appellants do question, however, whether it is an adequate administrative remedy. In order to fully understand these procedures we quote from the government's brief as submitted to the district court:

"[W]henever it comes to the Commission's attention that a particular contractual arrangement involves the performance on-site by employees of the contractor of work functions under the contract having such undesirable features as: (a) Such confusion of the actual contractual function being performed, as to give the appearance of a possible common-law employer-employee relationship existing between the contractor's employees, and Agency management; or (b) Such an

"inter-face" situation wherein the contractor employees perform their contractual work function side-by-side with appointed Civil Service employees doing similar work, in such a way as to create a situation or appearance that both kinds of workers are directly supervised by Federal managers. These undesirable features are to be corrected wherever they may be found to exist.

"The CSC counseling interest in contract matters is effectuated by means of the following Intra-Executive Department Procedure: (See Exhibit Y).

"(i) Consideration—separate and apart from any RIF appeal—will be given the matter by the CSC, upon receipt of information from any source that a particular contractual arrangement in actual operation involves either of the above-described undesirable features.

"(ii) The complaint or report will be preliminarily reviewed by the CSC. If no specific factual information is furnished to support the complaint, the complainant

Commission will investigate any complaint that the Pellerzi standards have been violated. Appellants have failed to show that resort to these procedures would be inadequate or futile. Under these procedures the Commission has full power to investigate any alleged violation and take such "immediate corrective action" as is warranted. Moreover, appellants' contention is a factual issue dealing with the administration of personnel in a federal agency. As stated in *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969), "it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based." Certainly, in such cases a factual background prepared by the agency is desirable and it cannot be said that the district court here abused its discretion in requiring exhaustion.

## COST COMPARISON STUDIES

In their fourth claim for relief appellants contended that the cost comparison study undertaken by the Air Force utilized erroneous figures and costs, thereby enabling the contractor cost to be lower than the civil service retention cost. The district court held that such claim was unreviewable under 5 U.S.C. § 701(a)(2). (Administrative Procedures Act.) The court found that the method by which the Air Force conducts its cost comparison studies was solely within the discretion of the Air Force and that there was no law to apply upon review. We do not find it necessary to pass upon the reviewability question as utilized by the district court since we hold that, for the reasons set forth earlier in this opinion, appellants do not have standing to challenge the cost comparison study.

Accordingly, the district court's granting of appellees' motion to dismiss is, in all respects, AFFIRMED.

will be afforded the opportunity to furnish particulars. But if no specific factual information as to the undesirable features are disclosed, the CSC may close the matter without further action.

"(iii) When a complaint raises a factually supported substantial issue concerning the undesirable features of a particular contractual arrangement, CSC will take the following steps:

"(a) Advise the Agency concerned that a substantial complaint regarding the particular contractual arrangement has been received and call upon the Agency to furnish copies of the contract; its comments relative to the complaint; any evidentiary materials it desired to submit in support of its comments; and any comments and supporting evidentiary materials the contractor concerned desired to have considered in the matter.

"(b) Submit copies of the material received from the Agency to the complainant, and call upon the complainant to furnish any comments and supporting evidentiary materials the complainant desires to have considered in the matter.

"(c) If the facts warrant: Consult with the Agency concerned with a view to immediate corrective action; if advisable, have an on-site investigation conducted jointly by CSC personnel and Agency representatives (or by a designated delegate of both the CSC and the Agency); and have a written report of the results of consultation (and investigation, if conducted) made part of the official CSC record in the matter.

"(d) If the situation warrants: Submit the written report of the results of the investigation to the complainant and the Agency, with all parties consulted called upon to furnish any comments and supporting evidentiary matters they desire to have considered in the matter.

"(iv) If the situation warrants, following completion of the procedure under (iii) above: The Agency head and the CSC Chairman will hold informal consultations, to determine whether they can agree on the corrective action which should be taken. The results of such consultation will thereafter be made part of the official record in the matter.

"(v) If the Agency head and the CSC Chairman cannot agree on the corrective action which should be taken, the matter will be submitted by the Agency and the CSC, on the record made under this procedure, for final resolution at the Presidential level of their differences. Such final resolution will be made part of the official record in the matter."