655 F.2d 283
 210 U.S.App.D.C. 170, 28 Cont.Cas.Fed. (CCH) 81,233
 CONTROL DATA CORPORATION, Appellant,
v.
Malcolm BALDRIGE, Secretary of Commerce, et al.
SPERRY CORPORATION, Appellant,
v.
Malcolm BALDRIGE, Secretary of Commerce.
HONEYWELL INFORMATION SYSTEMS, INC., Appellant,
v.
Malcolm BALDRIGE, Secretary of Commerce.
BURROUGHS CORPORATION, Appellant,
v.
Malcolm BALDRIGE, Secretary of Commerce, et al.
 Nos. 80-1143, 80-1152, 80-1165 and 80-1176.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 21, 1980.
Decided March 25, 1981.
Certiorari Denied Oct. 5, 1981.
See 102 S.Ct. 363.
 
 Eldon H. Crowell, Washington, D.C., with whom George D. Ruttinger and Peter F. Garvin, III, Washington, D.C., were on the brief, for appellant Control Data Corp. W. Stanfield Johnson and Robert O. Davis, Washington, D.C., also entered appearances for appellant Control Data Corp.
 James R. McAlee and Hadrian R. Katz, Washington, D.C., were on the brief for appellant Sperry Corp.
 Milton Eisenberg, Henry A. Hubschman, John B. Corr and Richard B. Berryman, Washington, D.C., were on the brief for appellant Honeywell Information Systems, Inc.
 George L. Christopher and Charles Lee Eisen, Washington, D. C., were on the brief for appellant Burroughs Corp.
 Mark N. Mutterperl, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Leonard Schaitman, Atty., U. S. Dept. of Justice, Washington, D. C., were on the brief, for appellees.
 Before TAMM and EDWARDS, Circuit Judges, and LLOYD F. MacMAHON,* U. S. District Judge for the Southern District of New York.
 Opinion for the court filed by Circuit Judge TAMM.
 TAMM, Circuit Judge:
 
 
 1
 Appellants, major manufacturers and suppliers of computer systems and equipment for the government, claim the right to challenge rules promulgated by the Secretary of Commerce. These rules, issued pursuant to the Secretary's authority under the Brooks Act, establish mandatory specifications governing virtually all procurements of computer equipment by the federal government. Appellants attacked these rules in the United States District Court for the District of Columbia, alleging that the Secretary's decision was arbitrary and capricious, that the Secretary exceeded his statutory authority, and that the administrative proceeding from which the rules emerged violated the Administrative Procedure Act. United States District Judge Penn refused to reach these contentions, however, ruling that appellants lacked standing to prosecute their claims. We find that a principled application of the amorphous "zone of interests" test compels this result and, accordingly, affirm the district court's decision.
 
 I. BACKGROUND
 
 2
 A. Legislative Concern: ADP Procurement and the Need for Standards
 
 
 3
 In 1965, recognizing that increasing governmental expenditures for automatic data processing (ADP) equipment required immediate legislative attention, Congress passed an amendment to the Federal Property and Administrative Services Act of 1949. Ch. 288, 63 Stat. 377 (codified in scattered sections of 40 & 41 U.S.C.). This amendment, known as the Brooks Act,[1] had as its avowed objective "the economic and efficient purchase, lease, maintenance, operation, and utilization of automatic data processing equipment by Federal departments and agencies." 111 Cong.Rec. 22,823 (1965) (remarks of Rep. Brooks). To achieve this objective, Congress attempted to create a "coordinated management program through which the Government (could) keep track of its ... investment and more wisely predict and control its future expenditures." Id. Pursuant to this program, management responsibilities were allocated among the General Services Administration, the Bureau of the Budget, and the Department of Commerce.
 
 
 4
 Under this allocation, the Secretary of Commerce was authorized to "undertake necessary research and to provide scientific and technological advisory services relating to the use of automatic data processing in the Government." Id. at 22,824 (remarks of Rep. Reid). The Secretary also assumed the responsibility for submission of recommendations to the President regarding the promulgation of uniform federal standards in the field.[2] This latter responsibility reflected clearly Congress's perception that the creation of standards would permit greater compatibility among systems, foster competition, and thereby promote more effectively the goal of efficient management of the government's ADP resources. Automatic Data Processing Equipment: Hearings on H.R. 4845 Before the Subcomm. on Government Activities of the House Comm. on Government Operations, 89th Cong., 1st Sess. 158-59 (1965) (statements of Rep. Brooks and Dr. William Eaton).
 
 
 5
 Since the passage of the Act, Congress has not only maintained this emphasis but has in addition more sharply defined its focus. The House Committee on Government Operations, for example, commented on the overall need for standards in its 1976 oversight report regarding the growing trend of noncompetitive ADP procurements by federal agencies. Urging that corrective measures be taken, the Committee suggested the following:
 
 
 6
 First and foremost is the development of meaningful hardware and software standards.... At the hearings, GAO expressed serious concern about the lack of progress being made by NBS in the development of standards. This concern of GAO was prompted, in large part, by its recognition that standards are essential to the achievement of full competition and to the saving of large sums of money by the Government. To date, NBS has only developed to a limited extent standards necessary to fully implement the Act, even though it acknowledged at its hearings that lack of standards seriously impedes effective competition. As the Computer Industry Association testified at the hearings, NBS has developed no meaningful hardware standards and only a relatively few software standards....
 
 
 7
 H.R.Rep.No.1746, 94th Cong., 2d Sess. 7 (1976).
 
 
 8
 Beyond this reiteration of the benefits arising from the promulgation of standards in general, however, Congress also identified specific areas in which particular standards would provide concrete advantages for government purchasing. One such standard was the "input/output channel level interface" standard (I/O standard). Input/output channels connect peripheral equipment such as display terminals, keyboards, and printers to the computer mainframe, which performs most of the computer's logical operations. The major computer manufacturers such as appellants and IBM offer their customers both mainframes and peripheral equipment, and it was from these "systems" manufacturers that federal agencies had usually purchased their ADP requirements. This practice, although more convenient for agency customers, was believed to be too expensive. Elmer Staats, Comptroller General, addressed this problem at hearings held by the Joint Economic Committee in 1970. At that time, he explained that the General Accounting Office (GAO) had determined in a recent study that more economical procurements could be made if some components were purchased from suppliers other than the mainframe supplier. According to the study, substantial savings could be achieved immediately through this procurement method because some of the components currently available were directly interchangeable, or "plug-to-plug compatible," with those of the major suppliers. Where the components were not plug-to-plug compatible, however, this method of procurement could be utilized only if adequate interfaces between the mainframe and the peripheral components were developed. Economy in Government Property Management Procurement of Data Processing Equipment: Hearing Before the Subcomm. on Economy in Government of the Joint Economic Comm., 91st Cong., 2d Sess. 4-5 (1970) (testimony of Elmer Staats). Such development would permit government agencies to derive from this marketing strategy maximum benefits competition among components manufacturers and "increased flexibility in the selection and use ... of those components best suited to achieve the desired objectives." Id. at 12 (statement of Elmer Staats).
 
 B. Development of the Present I/O Standard
 
 9
 Recognition of these benefits, however, did not induce, either easily or speedily, the creation of the desired standard. As early as 1967 the American National Standards Institute (ANSI) had established a joint industry-government committee intended, initially, to investigate the feasibility and practical impact of I/O interface standardization and, subsequently, to develop voluntary I/O standards for the industry. While the committee failed in its second objective, its failure did prompt congressional charges of purposeful industry delay and a call for mandatory standards promulgated by the government.[3]
 
 
 10
 Responding to this concern, the Department of Commerce published, and subsequently promulgated,[4] the four interface standards at issue here. These standards "define the mechanical, electrical and functional interface specifications for connecting computer peripheral equipment, such as magnetic tape and disk devices, as a part of medium and large scale automatic data processing (ADP) systems."[5] Decision Memorandum (D.M.) Regarding Recommended Federal Information Processing Standards for I/O Channel Level Interface (Jan. 22, 1979) at 1, Joint Appendix (J.A.) at 89. Through the promulgation of these standards, the Department expected to increase competition among peripheral equipment suppliers and thus enjoy lower purchasing costs and to increase opportunities for exchange or transfer of equipment among agencies, thereby employing more efficiently the government's existing ADP inventory. D.M. Regarding Recommended Federal Information Processing Standard for Rotating Mass Storage Subsystems (Aug. 8, 1979), J.A. at 102.
 
 
 11
 Appellants, submitting comments on the proposed standards, raised two principal objections. First, they argued that because the standards embodied IBM specifications to which appellants did not presently conform, appellants would be required to expend great amounts of time and money in order to compete for government ADP contracts. IBM would thus occupy a highly favored position vis-a-vis other ADP suppliers in the government market. Because appellants provide the only major alternatives to IBM, this disparity would hinder the operation of the desired competition. Appellants' second argument focused on the fact that the IBM specifications utilized by the Department were already fifteen years old. By mandating adherence to such standards, appellants contended, the Secretary was freezing a critical element of computer systems at an outdated level of technology, and effectively slowing the innovative process.
 
 
 12
 Contrary to these assertions, however, the Secretary found that the standards would not place any manufacturer at a competitive disadvantage. Indeed, according to the Secretary, over seventy manufacturers already made available to federal agencies equipment with interfaces of, or substantially similar to, the type established by the standards. In addition, the Secretary felt that delay of the effective date of the standards to three hundred days subsequent to promulgation provided noncomplying manufacturers with sufficient time to develop conforming interfaces. Finally, the Secretary found that the standards would not adversely affect technological innovation. In any event the standards would be evaluated within three years, at which time any adverse impact could be readily assessed. See Brief for Appellees at 15 n.7.
 
 C. The District Court Decision
 
 13
 Finding no relief at the administrative level, plaintiffs brought suit in the district court. They requested a judgment declaring the I/O standards to be invalid and enjoining the Secretary from enforcing those standards. United States District Judge Penn concluded, however, that the ADP suppliers lacked standing to assert their claims and dismissed the case in accordance with defendants' motion. Honeywell Information Systems, Inc. v. Hodges, 85 F.R.D. 339 (D.D.C.1980), J.A. at 156-64.
 
 
 14
 In reaching his decision Judge Penn held that plaintiff-suppliers must support their right to sue in two contexts constitutional and prudential. The constitutional burden, imposed by the Article III "case or controversy" limitation, requires that plaintiffs successfully demonstrate a "personal stake in the outcome of the litigation." Id. at 342, J.A. at 160. Citing Flast v. Cohen, 392 U.S. 83, 98, 101, 88 S.Ct. 1942, 1951, 1953, 20 L.Ed.2d 947 (1968), Judge Penn found that plaintiffs satisfied this standard because, as major suppliers of government ADP equipment, they would arguably suffer substantial economic injury if the standards they challenged were implemented. In the prudential context, however, Judge Penn found plaintiffs unable to meet their burden. The prudential considerations, as articulated in the "zone of interests" test, require plaintiffs to demonstrate that the interest they seek to protect is arguably within the zone of interests protected by the relevant statute. After examining both the purpose and the legislative history of the Brooks Act, Judge Penn determined that the Act is "merely designed to establish a more economic and efficient system for procurement of ADP equipment by the federal government." Id. at 343, J.A. at 162. He found nothing which implied that the statute is "directly or indirectly designed to afford protection for these plaintiffs," and concluded that "while the plaintiffs may suffer an economic loss and may well be a logical party to challenge the Standards, the interests they assert do not fall within the requisite zone of interests protected by the Act." Id., J.A. at 163.
 
 
 15
 Judge Penn also determined that these suppliers could not avoid their prudential burden by relying on Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970), and Ballerina Pen Co. v. Kunzig, 433 F.2d 1204 (D.C.Cir.1970), cert. dismissed, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). He found plaintiffs' reliance misplaced as those cases were "readily distinguishable" from the case they presented. 85 F.R.D. at 343, J.A. at 163. In both Scanwell and Ballerina Pen, the plaintiffs were disappointed bidders for government contracts. Moreover, in Ballerina Pen the court had actually applied the zone of interests test and found it satisfied, while in Scanwell the court "came close to articulating such a 'test' " and arrived at a decision "not inconsistent with later decisions applying the zone of interests test." Id. Having concluded, therefore, that plaintiffs could not satisfy in any manner the prudential aspects of the standing inquiry, Judge Penn granted defendants' motion to dismiss. Plaintiffs then filed a timely appeal.
 
 II. DISCUSSION
 
 16
 We begin our standing inquiry with a statement of the standard against which we must evaluate appellants' right to sue in the present instance. This standard establishes three requirements: 1) appellants must allege injury in fact;[6] 2) appellants must assert that arbitrary or capricious agency action injured an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; 3) there must be no "clear and convincing" indication of a legislative intent to withhold judicial review.[7] Ballerina Pen Co. v. Kunzig, 433 F.2d 1204, 1207 (D.C.Cir.1970), cert. dismissed, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971). The first requirement need not detain us long. Appellants have alleged here that the implementation of the I/O standards will cause them substantial economic injury. They claim that if they choose to comply with the standards, they must expend considerable time and effort to ensure the equipment's conformance to the mandated specifications. If they choose not to comply, they will be effectively precluded from offering their products in the government ADP market. Such allegations sufficiently describe the specific injury appellants will sustain as a result of the Secretary's action. Like the district court, then, we believe that appellants have demonstrated the requisite "personal stake" in the litigation and meet, thereby, their constitutional burden.
 
 
 17
 Appellants' attempts to fulfill the prudential requirement, on the other hand, require extended consideration. Appellants make two arguments in support of their contention that they satisfy the zone of interests test.[8] First, they assert that their interest in continuing to compete for federal ADP contracts is arguably within the zone of interests protected by the Brooks Act and the Federal Property and Administrative Services Act of which the former is a part. They argue that competition has been recognized as an effective avenue to the accomplishment of the professed goals of these statutes, and that by challenging standards which allegedly inhibit competition appellants promote the congressional interest in free and open competition. Second, appellants contend that, under the rationale of Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970) and its progeny, they may act as private attorneys general to vindicate the public interest in maintaining full competition for federal ADP contracts. The economic loss that they will sustain from the implementation of the challenged standards, appellants claim, makes them the logical party to assert the public interest in ensuring the Secretary's compliance with his congressional mandate.
 
 
 18
 Appellees, on the other hand, argue that the principles of Scanwell must be limited to the bidder context in which they were expressed, and that, in any event, Scanwell and its successors do not excuse appellants from satisfying the zone test. Appellees further assert that appellants cannot meet the zone standard, for the legislative history shows conclusively that the Brooks Act is merely a "housekeeping" statute, and that Congress undertook its quest for competition to improve the government's bargaining position vis-a-vis ADP suppliers, reducing thereby the government's ADP expenditures. Therefore appellants are not, in any sense, intended beneficiaries of the Brooks Act, and their economic interests must necessarily fall without the zone of interests protected by that statute.
 
 
 19
 A careful evaluation of the parties' contentions demands, in the first instance, a viable standard against which they can be measured. In this case the acknowledged standard is the zone of interests test. The test's amorphous nature, however, makes application difficult and careful evaluation impossible absent some refinement. To apply the zone of interests standard in a principled fashion, then, we must attempt to give it content and form, definition and scope. For this purpose we proceed to an examination of the origins of the test and of its present status.
 
 
 20
 The zone of interests test made its initial appearances in four cases decided by the Supreme Court in 1970 and 1971. In the first of these, Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), sellers of data processing services sought to challenge a ruling by the Comptroller of the Currency that national banks could make data processing services available to banks and their customers. These sellers had been denied standing on the ground that they had no cognizable "legal interest" in the allegedly unlawful competition approved by the Comptroller. The Court rejected this theory as a basis for the denial of standing, stating that while the legal interest criterion was pertinent to a determination of the merits, the relevant inquiry for standing purposes was "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Id. at 153, 90 S.Ct. at 830. Having thus identified the relevant test, the Court briefly concluded without further explanation or articulation of the criteria governing its application of the test that section 4 of the Bank Service Corporation Act[9] arguably brought a competitor within the zone of interests protected by it.
 
 
 21
 On the basis of this conclusion, the Court thereafter granted standing in two other cases challenging attempts by banks to extend the range of their proffered services. In Arnold Tours, Inc. v. Camp, 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970), travel agents sought, again under section 4, the right to contest the Comptroller's ruling that national banks could provide travel services for their customers. Remarking that nothing in Data Processing limited the protection provided by section 4 to competitors in the data processing field,[10] the Court upheld the right of these agents to sue, explaining that "(w)hen national banks begin to provide travel services for their customers, they compete with travel agents no less than they compete with data processors when they provide data-processing services to their customers." Id. at 46, 91 S.Ct. at 159 (footnote omitted). In Investment Co. Institute v. Camp, 401 U.S. 617, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971), challenges were made to portions of a regulation issued by the Comptroller which purported to "authorize banks to establish and operate collective investment funds...." Id. at 619, 91 S.Ct. at 1093. This time, however, petitioners invoked not the prohibitions of section 4 of the Bank Service Corporation Act, but the strictures of sections 16 and 21 of the Glass-Steagall Act of 1933. 12 U.S.C. §§ 24, 378(a) (1976). This difference exerted no apparent influence on the Court's decision. Instead, framing the issue as whether national banks could legally compete with open-end investment companies or securities dealers, the Court found no distinction between the competition presently challenged under the Glass-Steagall Act and the competition it had found in Data Processing to be within the relevant zone of interests of the Bank Service Corporation Act. Accordingly, the Court concluded that opposition to petitioners' standing to sue was foreclosed by its decision in Data Processing.
 
 
 22
 The fourth case, unlike the others, did not involve a challenge to attempted expansion of national banking activities. Rather, in Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), cash rent farmers protested a regulation promulgated by the Secretary of Agriculture which defined "making a crop" in a manner adverse to their interests. In its evaluation of petitioners' right to bring this action, the Court examined the Food and Agriculture Act of 1965 and its legislative history, as well as the legislative history of the "making a crop" provision. Id. at 164-65, 90 S.Ct. at 836-37. Each of these sources, in the Court's opinion, indicated that Congress intended the interests of tenant farmers to be protected by the Secretary. The tenant farmers were therefore "clearly" within the zone of interests protected by the Act and entitled to maintain their challenge to the Secretary's regulation.
 
 
 23
 In these four cases the Supreme Court discarded the outdated legal interest criterion and interposed a new zone of interests test more compatible with the perceived trend toward the enlargement of the class of persons entitled to protest administrative action. Data Processing, 397 U.S. at 154, 90 S.Ct. at 830. This new test was starkly stated, however, without accompanying expression of the methods to be utilized in its application. Moreover, the Court's own applications of the fledgling standard were generally conclusory in nature, and consequently failed to provide the desired clarification.
 
 
 24
 Despite the difficulties engendered by this lack of guidance, the Court has not attempted to develop, in the years since Data Processing and its immediate progeny, a more mature zone of interests standard. In that time the Court has specified no guidelines for the test's application nor has it even undertaken to apply the zone test in a standing inquiry. At least one commentator has suggested that this neglect indicates the Court's implicit abandonment of the zone standard.[11] The Court's express reaffirmation of the test's existence, albeit in summary fashion,[12] requires us to assume, however, the test's continued role as a prudential limitation.[13] We must, therefore, apply the test despite the Court's failure to provide more specific guidance.
 
 
 25
 In light of this conclusion we pause to address appellants' contention that they possess standing on the basis of the rationale articulated in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir.1970). In Scanwell, a pre-Data Processing case, this court held that a disappointed bidder had standing to challenge a contract award by the Federal Aviation Administration. The court based its conclusion on the premise that Congress could, subject to constitutional restraints, empower any person to bring suit in the public interest even where that person was unable to demonstrate injury to a legally protected right. In the Administrative Procedure Act (APA), Congress had conferred the right of judicial review upon any person "adversely affected or aggrieved by agency action." 5 U.S.C. § 702 (1976). The court concluded that disappointed bidders were persons aggrieved by the loss of a contract award causing them cognizable economic injury. This injury, the court believed, would provide such bidders with adequate incentive to challenge the allegedly illegal action and ensure as well the genuine adversariness required by the case or controversy limitation of Article III. Thus, the court determined, allowing disappointed bidders to bring suit would permit them to "vindicate their very real interests" and further as well "the public interest in having agencies follow the regulations which control government contracting." Id. at 864.
 
 
 26
 Appellants suggest that they may similarly vindicate the public interest in the Secretary's fulfillment of his congressional mandate to maintain a competitive procurement process. We recognize that, like the disappointed bidder in Scanwell, appellants here allege a substantial economic loss from the challenged agency action. We acknowledge as well the undoubted public interest in having the Secretary give appropriate attention to the importance of competition in his formulation of I/O interface standards. Because we have determined that the zone standard must be applied where appropriate, however, we cannot sustain appellants' standing solely on this basis unless we find that the standard is inapplicable to the bidder situation and that the Scanwell rationale should be extended beyond its "disappointed bidder" context. We can indulge appellants on neither point.
 
 
 27
 Appellants argue that Merriam v. Kunzig, 476 F.2d 1233 (3d Cir.), cert. denied, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973),[14] Constructores Civiles de Centroamerica, S.A. v. Hannah, 459 F.2d 1183 (D.C.Cir.1972), see note 22 infra, and Ballerina Pen Co. v. Kunzig, 433 F.2d 1204 (D.C.Cir.1970), cert. dismissed, 401 U.S. 950, 91 S.Ct. 1186, 28 L.Ed.2d 234 (1971),[15] support their contention that a government contractor who has suffered economic injury as a result of illegal agency action may, even after Data Processing, vindicate the public interest by bringing suit against the errant agency. In making this assertion they note the lack of an explicit zone analysis in Ballerina Pen, the observation in Constructores that "some of our decisions indicate that injury in fact alone may suffice to establish standing," 459 F.2d at 1188, and the expressed willingness in Merriam to recognize appellant's standing even on the assumption that he did not fall within the zone of interests protected by the relevant statute. 476 F.2d at 1242 n.7.
 
 
 28
 A closer look at these cases, however, reveals the fragility of the foundation upon which appellants would have us premise their standing. In each of these cases the zone test was explicitly recognized as a relevant part of the standing inquiry. In both Constructores and Merriam, moreover, the courts expressly determined the appellants to be within the relevant zone of interests, while in Ballerina Pen the court discerned from the legislative history a congressional intent to protect the appellants from the type of action challenged. In none of these post-Data Processing cases did the court actually base its grant of standing solely upon an asserted economic injury. We cannot, therefore, purport to do so on the authority of their holdings. See Kinnett Dairies, Inc. v. Farrow, 580 F.2d 1260, 1265 (5th Cir. 1978).
 
 
 29
 Even were we to read those cases as broadly as appellants request, however, we would be unable to justify the extension of the Scanwell rationale to these circumstances. Appellants here cannot claim the special relationship found by the Merriam court to exist between a bidder and the government; unlike the bidder in the context of a solicitation, they have not "placed in the hands of the representatives of the Government the power to bind (them) to a contract." 476 F.2d at 1242 n.7. Appellants cannot, moreover, claim the special injury discerned in Ballerina Pen absolute preclusion from the government market. They are instead free to decide whether to conform to the proposed specifications or to withdraw from the government market. We find in this case, then, none of the special factors present in the bidder cases which made a grant of standing particularly appropriate.
 
 
 30
 We find, in addition, a more important distinction between this case and those in the bidder area: these circumstances offer the potential for impermissible intrusion upon the government's prerogative to dictate the specifications for the products it wishes to purchase. Characterized by the Supreme Court in Reeves, Inc. v. Stake, 447 U.S. 429, 100 S.Ct. 2271, 2278 n.12, 65 L.Ed.2d 244 (1980) as the " 'unrestricted power ... to fix the terms and conditions upon which it (the Government) will make needed purchases,' " quoting Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 876, 84 L.Ed. 1108 (1940), this prerogative is one traditionally exercised by the legislative and executive branches rather than the judiciary. As this court recently noted in American Federation of Labor v. Kahn, 618 F.2d 784, 794 n.55 (D.C.Cir.) (en banc), cert. denied, 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1970), "nothing has undercut (this) view of the Government's contracting power." Accordingly, we cannot allow appellants to challenge, on the basis of the Scanwell rationale, the government specifications embodied in the I/O interface standards absent some demonstration by appellants that they meet the zone standard. We turn, therefore, to the case law of the federal courts for help in making a principled application of that standard.
 
 
 31
 (5) A survey of this law reveals, however, more variety than uniformity among the approaches to the zone test. Some courts, reacting strongly to the Supreme Court's vague formulation of the test, have expressed disagreement with the standard,[16] clearly misapplied it,[17] or virtually ignored it.[18] Other courts, taking a more active approach, have attempted to refine the test into a workable standard. As a result of these efforts, it is generally recognized that in applying the zone test a court must discern whether the interest asserted by a party in the particular instance[19] is one intended by Congress to be protected or regulated by the statute under which suit is brought. Constructores Civiles de Centroamerica, S.A. v. Hannah, 459 F.2d 1183, 1188 (D.C.Cir.1972). Most courts also acknowledge that the sources pertinent to this examination are the language of the relevant statutory provisions[20] and their legislative history.[21] See, e. g., American Federation of Government Employees v. Dunn, 561 F.2d 1310, 1312-13 (9th Cir. 1977); Rodeway Inns of America, Inc. v. Frank, 541 F.2d 759 (8th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); Window Systems, Inc. v. Manchester Memorial Hospital, 424 F.Supp. 331, 336 (D.Conn.1976). An application of the test under even this approach, however, still affords a court great latitude in defining the scope of the relevant zone; the conclusions it derives from these legislative sources will vary according to the nature and quantity of the "beneficial indicia" it requires.[22]This court has stated that "slight" beneficial indicia will be sufficient to sustain a party's assertion of standing. Constructores Civiles de Centroamerica, S.A. v. Hannah, 459 F.2d 1183, 1189 (D.C.Cir.1972). Although this standard would seem to invite a liberal interpretation of congressional intent, our review of the relevant statutory provisions and legislative history reveals no evidence of an intent to protect or benefit these appellants. As discussed in Part I.A of this opinion, the Brooks Act was passed as an amendment to the Federal Property and Administrative Services Act of 1949. Both statutes express congressional interest in economic and efficient procurement of property, 40 U.S.C. § 759(a) (1976) and 40 U.S.C. § 471 (1976); in both Congress recognized the maximization of competition as an important means to its objective. 41 U.S.C. § 253(a) (1976) and H.R.Rep.No.802, 89th Cong., 1st Sess. 25 (1965). This interest in competition is not, however, congruent with that interest in competition asserted by appellants. Appellants, as major suppliers, wish to challenge the I/O standards promulgated by the Secretary of Commerce because these standards will require appellants to make considerable expenditures of time and money to produce equipment suitable for the government ADP market. Appellants believe that these resulting costs will destroy not only their individual competitive positions but also their collective position as the sole realistic alternative to IBM. Thus appellants' interest in competition is rooted in economic self-preservation.
 
 
 32
 The congressional interest in competition, when viewed in its proper context, is grounded upon a quite different premise. The Brooks Act resulted from a growing perception that certain trends in ADP acquisition and use were leading to "costly inefficiencies." H.R.Rep.No. 802, 89th Cong., 1st Sess. 18 (1965). To avoid these inefficiencies, Congress established in the Act a coordinated management program directed particularly toward the economic acquisition of ADP equipment. Such acquisition, in turn, depended upon the successful implementation of several proposals, including the improvement of the government's bargaining position vis-a-vis ADP suppliers through volume acquisition,[23] id. at 27-29; the selection of equipment offering the largest purchase advantage on a government-wide basis, id. at 32-34; the creation of adequate standards, id. at 22, and the increase of competition among suppliers, id. at 25, 28-29. Despite this variety of approaches, however, only one end was sought lower government ADP costs. See, e. g., id. at 20, 36. Competition was not, therefore, valued for itself, but for the benefits it could bring the government. See, e. g., id. at 25.
 
 
 33
 Since the passage of the Brooks Act, Congress has maintained its interest in competition.[24] The standards challenged here were intended to foster competition among systems manufacturers and between such manufacturers and peripheral suppliers. Consistent with the indications of congressional intent just discussed, however, this increased competition was expected to inure to the benefit of the government, rather than ADP suppliers. We note, moreover, that to enjoy these advantages Congress was determined to obtain an effective I/O interface standard, despite its recognition of the possible adverse effects on ADP suppliers such as appellants.[25] In light of these consistent congressional indicators, therefore, we cannot find that appellants' interest lies within that zone of interests intended to be protected by the Brooks Act.[26]
 
 III. CONCLUSION
 
 34
 In sustaining the district court's denial of standing, we do not feel that we have insulated the Secretary's action from critical review. The Secretary has stated that the standards will be reviewed within three years of their effective date and are subject at that time to revision or withdrawal if technological trends or other factors so require. 44 Fed.Reg. 10,100 (1979). More importantly, however, if these standards do seriously discourage the competition they were intended to promote, it is very likely that Congress will interject itself into the process and insist upon the necessary corrective measures. Certainly, Congress has been quite zealous in its previous oversight of the Brooks Act. It has held numerous hearings and made voluminous criticisms of the agencies' implementations of the Act's provisions and policies in the years since that Act's passage.[27] We find no reason to assume that these congressional efforts will decrease either in vigor or number.
 
 
 35
 While we realize that these observations offer small comfort in the face of the economic injury appellants may suffer, we feel our decision is compelled by the present law of standing. Although confusing and perhaps inconsistent,[28] that law dictates the continued role of the zone of interests tests as a prudential limitation. We must therefore apply the test in appropriate circumstances and in a manner calculated to serve its intended purpose of
 
 
 36
 allowing courts to define those instances when it believes the exercise of its power at the instigation of a particular party is not congruent with the mandate of the legislative branch in a particular subject area.
 
 
 37
 Tax Analysts, 566 F.2d at 140.
 
 
 38
 We have found no justification for avoiding the application of the zone test to the present circumstances. We believe, moreover, that because these circumstances involve the government's prerogative to dictate the specifications of those products it will purchase, our application must fully reflect our awareness of the test's importance as a limitation on the role of the courts in resolving public disputes. In light of this obligation we have scrutinized carefully the legislative history and defined accordingly the scope of the zone of interests protected by the Brooks Act. As drawn, this zone of interests must exclude appellants. Accordingly, the decision of the district court is
 
 
 39
 Affirmed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976)
 
 
 [1]
 The Brooks Act provides in pertinent part:
 The Secretary of Commerce is authorized (1) to provide agencies, and the Administrator of General Services in the exercise of the authority delegated in this section, with scientific and technological advisory services relating to automatic data processing and related systems, and (2) to make appropriate recommendations to the President relating to the establishment of uniform Federal automatic data processing standards. The Secretary of Commerce is authorized to undertake the necessary research in the sciences and technologies of automatic data processing computer and related systems, as may be required under provisions of this subsection.
 40 U.S.C. § 759(f) (1976).
 
 
 [2]
 The development of recommended standards within the Department was entrusted to the National Bureau of Standards (NBS). Automatic Data Processing Equipment: Hearings on H.R. 4845 Before the Subcomm. on Government Activities of the Comm. on Government Operations, 89th Cong., 1st Sess. 154 (1965) (statement of Dr. William Eaton), quoting Circular A-71, para. 5(d) (Bureau of the Budget) (March 6, 1965)
 
 
 [3]
 The House Report following hearings conducted in 1976 on the implementation of the Brooks Act reflects congressional determination to obtain the I/O standards. In its discussion of the failure of NBS to develop these standards, the Report states:
 ... NBS has not aggressively pursued the development of these standards because it apparently has been committed to the adoption of voluntary standards developed under American National Standards Institute (ANSI) procedures. This voluntary process under ANSI is generally sound so long as it does not unduly impede the development of worthwhile standards. When, however, as in the case of the Input/Output Interface standards, conflicting interests serve to preclude the timely adoption of a standard, NBS has the obligation to develop Federal Standards....
 It has been alleged that the development of ADP standards will preclude the Government from taking advantage of technological advances and perhaps even stifle the development of such advances. If, in fact, there is any validity to this allegation, the pitfalls suggested therein can be avoided by NBS maintaining constant vigilence (sic) to assure that standards are modified in accordance with advances in technology.
 H.R.Rep.No.1746, 94th Cong., 2d Sess. 8 (1976).
 
 
 [4]
 The President transferred his authority to approve standards to the Secretary of Commerce in Exec. Order No. 11717, Section 2, 38 Fed.Reg. 12,315 (May 11, 1973), reprinted in 31 U.S.C. § 16 note (1976)
 
 
 [5]
 Small scale systems with a purchase price of less than $400,000 were exempted by the Department of Commerce. 44 Fed.Reg. 16,466 (1979)
 
 
 [6]
 The Supreme Court has expounded upon the nature of this constitutional aspect of the standing inquiry since our decision in Ballerina Pen. In Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), for example, the Court emphasized that a plaintiff must show "an injury to himself that is likely to be redressed by a favorable decision." Id. at 38, 96 S.Ct. at 1924. As the Court explained, this constitutional requirement mandates "that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Id. at 41-42, 96 S.Ct. at 1925-1926. As we point out, appellants here have alleged a specific economic injury caused by the Government. This constitutional requirement has therefore been met
 
 
 [7]
 In light of our disposition of this case, we find it unnecessary to reach this third criterion
 
 
 [8]
 We find appellants' third argument that they have common-law standing to challenge the Secretary's action in wrongfully interfering with their business relationships to be wholly without merit
 
 
 [9]
 Section 4 provided that "(n)o bank service corporation may engage in any activity other than the performance of bank services for banks." 12 U.S.C. § 1864 (1976)
 
 
 [10]
 The Court stated:
 The only legislative history of the Bank Service Corporation Act mentioned in the opinion was that § 4 was a " 'response to the fears expressed by a few senators, that without such a prohibition, the bill would have enabled "banks to engage in a nonbanking activity," S.Rep.No. 2105 (87th Cong., 2d Sess., 7-12) (Supplemental views of Senators Proxmire, Douglas, and Neuberger), and thus constitute "a serious exception to the accepted public policy which strictly limits banks to banking." (Supplemental views of Senators Muskie and Clark).' " 397 U.S. at 155 (90 S.Ct. at 831).
 400 U.S. at 46 n.3, 91 S.Ct. at 159 n.3.
 
 
 [11]
 K. Davis, Administrative Law Treatise § 22.02-11, at 509 (Supp.1976) ("a second reason for doubting that the 'zone' test is the law is that the Supreme Court itself has not followed it.")
 
 
 [12]
 See, e. g., Sierra Club v. Morton, 405 U.S. 727, 733 & n.5, 92 S.Ct. 1361, 1365 & n.5, 31 L.Ed.2d 636 (1972); United States v. SCRAP, 412 U.S. 669, 686 & n.13, 93 S.Ct. 2405, 2415 & n.13, 37 L.Ed.2d 254 (1973); Simon v. Eastern Kentucky Welfare Rights Organization, 426 U.S. 26, 39 n.19, 96 S.Ct. 1917, 1924 n.19, 48 L.Ed.2d 450 (1976); Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100 n.6, 99 S.Ct. 1601, 1608 n.6, 60 L.Ed.2d 66 (1979)
 In Gladstone, for example, the Court addressed the zone standard in this manner:
 There are other nonconstitutional limitations on standing to be applied in appropriate circumstances. See, e. g., Simon v. Eastern Kentucky Welfare Rights Org ... ("the interest of the plaintiff, regardless of its nature in the absolute, (must) at least be 'arguably within the zone of interests to be protected or regulated' by the statutory framework within which his claim arises." Quoting Data Processing Serv. v. Camp ....).
 Id.
 
 
 [13]
 Congress has the power to eliminate this prudential limitation, and apparently attempted to do so in 1976. At that time the subcommittee on Administrative Practice and Procedure of the Senate Judiciary Committee examined several bills "to expand and improve the Administrative Procedure Act." Included among the proposed "Administrative Procedure Act Amendments of 1976" was S. 3296. Under this provision standing was to be granted to any person who had participated in an agency proceeding giving rise to the agency action of which review was sought, or to any interested person who satisfied certain procedural requirements. The explicit intent of the provision was "to establish clear standards by which courts and litigants alike can readily determine whether a given plaintiff has standing" and to "eliminate nonessential, 'prudential limitations' on standing...." Administrative Procedure Act Amendments of 1976: Hearings Before the Subcomm. on Administrative Practice and Procedure of the Senate Comm. on the Judiciary, 94th Cong., 2d Sess. 40 (1976)
 
 
 [14]
 In Merriam the court allowed a disappointed bidder to challenge a contract for leasehold space awarded by the General Services Administration pursuant to the Federal Property and Administrative Services Act. Remarking that procurement procedures established by that Act forbade the acceptance of a nonconforming bid, the court concluded that "the statute protects not only the Government's interest in securing advantageous contracts, but also the interest of those responding to the Government's invitation to do business with it." 476 F.2d at 1242 (footnote omitted)
 
 
 [15]
 In Ballerina Pen this court granted standing to ball point pen suppliers seeking to challenge the inclusion of ball point pens on the Schedule of Blind-Made Products. Under the Wagner-O'Day Act, 41 U.S.C. §§ 46-48 (1976), products on this schedule would be provided to the government by non-profit agencies for the blind, rather than by a contractor selected through the usual competitive bid system. The court allowed the suppliers to challenge their exclusion from the government market after determining that Congress had expressed some concern for private industries which might be disadvantaged by the inclusion of certain products on the schedule. 433 F.2d at 1213
 
 
 [16]
 See, e. g., Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208 (8th Cir. 1972). In this case the court recorded its "preference for simplifying the 'law on standing.' We think that all that is required for a plaintiff to have standing to sue for a constitutional or statutory violation is a showing of 'injury in fact.' " Id. at 1212 n.4
 
 
 [17]
 See Upper Pecos Ass'n v. Stans, 452 F.2d 1233, 1235 (10th Cir. 1971), vacated on other grounds, 409 U.S. 1021, 93 S.Ct. 458, 34 L.Ed.2d 313 (1972), and Izaak Walton League of America v. St. Clair, 313 F.Supp. 1312, 1316-17 (D.Minn.1970). See also Gibson & Perin Co. v. City of Cincinnati, 480 F.2d 936 (6th Cir.), cert. denied, 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973)
 
 
 [18]
 See, e. g., Florida v. Weinberger, 492 F.2d 488, 494 (5th Cir. 1974) (grant of standing to the state plaintiff solely on the basis of its "clear interest ... in the manner in which the Medicaid program is administered vis-a-vis its citizens and in being spared the reconstitution of its statutory program...."); William F. Wilke, Inc. v. Department of Army of United States, 485 F.2d 180 (4th Cir. 1973) (grant of standing to a disappointed bidder for a government contract without mentioning the zone standard)
 
 
 [19]
 As this court explained in Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 142 n.76 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978):
 We are aware of the confusion surrounding the meaning of which interests are relevant to the zone test .... Essentially, the confusion surrounds what exactly has to fall within the relevant zone: 1) the parties themselves; 2) the interests of the parties in general; or 3) the particular interest the parties are asserting in the litigation. It seems clear to us that the particular interests are the relevant interests in the context of an application of the zone standard ....
 
 
 [20]
 In determining which provisions are relevant to this examination, this court has stated that it will look to the particular statutory provision at issue in a case, rather than the entire statutory framework. It has acknowledged, however, that both the particular and general may be relevant sources where they share an identity of purpose. See Tax Analysts & Advocates v. Blumenthal, 566 F.2d 130, 140-41 (D.C.Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978)
 
 
 [21]
 We do not believe that our examination of the legislative history and subsequent congressional commentary here conflicts with this court's discussion in Tax Analysts, 566 F.2d at 140-43. Congressional intent regarding ADP suppliers is clearly reflected in the legislative history and confirmed by the longstanding oversight of the Act's implementation by its sponsor and other members of Congress
 
 
 [22]
 Compare, e. g., Constructores Civiles de Centroamerica, S.A. v. Hannah, 459 F.2d 1183 (D.C.Cir.1972), and Diggs v. Shultz, 470 F.2d 461 (D.C.Cir.1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973), with Rodeway Inns of America, Inc. v. Frank, 541 F.2d 759 (8th Cir. 1976), cert. denied, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977). In Constructores, the court held that a Honduran corporation had standing to challenge its disqualification as a bidder on a contract awarded under a loan agreement negotiated between the Agency for International Aid and the Central American Bank for Economic Integration and authorized by the Foreign Assistance Act of 1961, 22 U.S.C. § 2151 et seq. (1970). Noting that this zone of interests test could be satisfied by "slight beneficiary indicia," 459 F.2d at 1189, the court found such indicia upon examination of relevant statutory provisions and the policy statement of the Foreign Assistance Act. The court explained:
 These broadly stroked provisions obviously do not specify particular individuals or groups to be served by the loan assistance program. The statute speaks to socio-economic interests of the peoples of Latin America. However, the requirement for standing is only that the asserted interest be arguably within the zone of interests sought to be protected. Certainly the economy of a country is dependent upon the stability of local business enterprises such as CONCICA. Suffice it to say that the challenging party need only show that it is an intended beneficiary of the statute not necessarily the primary one.
 Id.
 The court defined a similarly broad zone in Diggs when it permitted persons denied entry and emigres denied re-entry into Rhodesia to challenge the congressional decision to permit importation of materials from that country in alleged violation of the United States commitment to a United Nations embargo on trade with Rhodesia. In defining the scope of the protected zone, the court stated that "United Nations Security Council Resolution 232 was and is an attempt by means of concerted international pressure to turn the Rhodesian Government away from the course of action which has resulted in the adverse circumstances experienced by appellants. They are unquestionably within the reach of its purpose and among its intended beneficiaries." 470 F.2d at 464.
 Rodeway, on the other hand, arguably represents a more restrictive application of the test. In that case the court held that hotel owners would not be heard to challenge a decision by the Department of Housing and Urban Development to convert an apartment building into a hotel. The court denied standing in light of the purposes of the National Housing Act, 12 U.S.C. § 1701 et seq. (1976), even though two sections of the Act did provide protection to competition. 541 F.2d at 765-66.
 
 
 [23]
 As the Comptroller General explained in his testimony on H.R. 4845:
 The system of procurement must be altered so that the Government's bargaining position is improved in a substantive sense by centralized procurement to obtain discounts for quantity purchases.
 Strengthening of the Government's bargaining position will, in turn, lead to better contract provisions.
 Automatic Data Processing Equipment: Hearings on H.R. 4845 Before the Subcomm. on Government Activities of the House Comm. on Government Operations, 89th Cong., 1st Sess. 20 (1965) (statement of Joseph Campbell).
 
 
 [24]
 See, e. g., H.R.Rep.No.96-694, 96th Cong., 1st Sess. 62 (1979):
 The Brooks Act is grounded upon two basic objectives: (1) ADP resources should be procured as economically and efficiently as possible; and (2) only those resources should be procured which are needed and which can assist (rather than retard) the management of Government programs.
 To accomplish the first objective, it is essential that Federal agencies be required to procure their ADP requirements on a fully competitive basis unless exceptional circumstances intervene.
 (Emphasis added).
 We realize, of course, that post-enactment congressional discussion of legislation is to be given limited weight in statutory construction. We include such discussion here, however, for its value as a persuasive manifestation of the consistent congressional approach to the Brooks Act.
 
 
 [25]
 In hearings conducted by the Joint Economic Committee in 1970, Chairman Proxmire expressed his concern that the slow progress was attributable to industry "foot-dragging":
 Chairman PROXMIRE. You see what I am getting at is the role of the industry, the role of the private parties here.... Do, for instance, the private parties through organizations such as ASI, or (ANSI) have a practical or effective veto over what the Department of Commerce has? (sic)
 Mr. INK. The problem here, Mr. Chairman, is getting standards which are workable and realistic.... We can come up with standards, in effect, by edict insofar as Government procurement is concerned, but we don't want to come up with standards for the sake of standards. We want to come up with standards that are workable....
 Chairman PROXMIRE. But that determination ought to be made by you. You see what concerns me there is ... a vested interest by the big, very powerful and influential firms in the field to prevent this cost-reducing competition. They are doing mighty well under present circumstances, and if competition gets tough and drives down the cost to the Government their profits are going to diminish.
 So they have a real vested interest in exercising their position to drag their feet as long as they can.
 Economy in Government Property Management Procurement of Data Processing Equipment: Hearing Before the Subcomm. on Economy in Government of the Joint Economic Comm., 91st Cong., 2d Sess. 52-53 (1970) (exchange between Sen. Proxmire and Mr. Dwight Ink).
 
 
 [26]
 Appellants also argue that their interest lies within that zone protected by the Federal Property and Administrative Services Act of 1949 (FPASA). Ch. 288, 63 Stat. 377 (codified in scattered sections of 40 & 41 U.S.C.). The Brooks Act and the FPASA share the purpose of economical and efficient procurement and an interest in maximizing competition. As with the Brooks Act, however, there is no indication that the competition sought by Congress was intended to inure to the benefit of those in appellants' position. Cf. Public Citizen v. Lockheed Aircraft Corp., No. 74-535 (D.D.C. Jan. 8, 1975) (denial of competitor standing under the FPASA), aff'd, 565 F.2d 708 (D.C.Cir.1977)
 
 
 [27]
 See, e. g., Economy in Government Property Management Procurement of Data Processing Equipment: Hearing Before the Subcomm. on Economy in Government of the Joint Economic Comm., 91st Cong., 2d Sess. (1970); Army Procurement of Computer Systems: Hearing Before the Subcomm. on Legislation and National Security of the Comm. on Government Operations, 94th Cong., 1st Sess. (1975); Review of Administration of Public Law 89-306, Procurement of ADP Resources by the Federal Government: Hearings Before the Subcomm. on Legislation and National Security of the House Comm. on Government Operations, 94th Cong., 2d Sess. (1976); H.R.Rep.No.1746, 94th Cong., 2d Sess. (1976); H.R.Rep.No.694, 96th Cong., 1st Sess. (1979)
 
 
 [28]
 We are not unmindful of the quality of fantasy or play in the search for beneficiaries. "Litigants search for a personality that will fit the demands of the court, tailor their attributes, paint their faces, manipulate their identities, and attend a masked ball where they hope to receive a prize for the imagination and ingenuity they display." J. Vining, Legal Identity 123 (1978). We do not believe that it is our place, however, to call a halt to this "masked ball."