NEW YORK TELEPHONE COMPANY, Plaintiff,

v.

The SECRETARY OF the ARMY, et al., Defendants.

Civ. A. No. 86–2254.

United States District Court, District of Columbia.

Sept. 26, 1986.

Togo D. West, Jr., Karl F. Schneider, R. William Barton, Washington, D.C., for plaintiff.

Mark E. Nagle, Paul L. Colby, Asst. U.S. Attys., Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiff by its complaint attacks the legality of an Army procurement for telecommunications equipment and its subsequent maintenance required at Fort Drum, New York. The Army has decided to purchase the equipment and provide for maintenance of this and other equipment separately. However, plaintiff is required under its tariffs to lease and maintain its equipment. Thus it is excluded from participating in the Army's solicitation of bids for this part of a larger Fort Drum equipment procurement. Plaintiff claims federal procurement statutes and regulations designed to encourage competition require the Army to allow it to bid on a lease basis and to defer its decision between purchase and lease until receipt of all bids.

The issues tendered are legal, not factual, and accordingly with consent of the parties, plaintiff's motion for preliminary injunction and the defendants' opposition, which were fully briefed and argued, are treated as final submissions on the merits

pursuant to Fed.R.Civ.P. 65(a)(2). The Court has jurisdiction under the *Scanwell* doctrine.

**Facts**

In the past, Fort Drum has served as a relatively minor Army outpost. The Army has decided to increase dramatically the mission of Fort Drum by expanding it to serve as headquarters for the Tenth Light Infantry Division (also referred to as the Tenth Mountain Division), a specialized group of infantry troops. Accordingly, the Army is currently constructing over 100 facilities to house, train and support the new troops, who will be billeted there commencing in September 1987. The Army's construction plan calls for periodic solicitation of private bids for installation of a variety of electronic equipment, including data processing, visual information, telecommunications, printing and other hardware as the various elements of the expanded mission are developed and phased into place.

The Army has also made plans for the operation and maintenance support required for the equipment involved in the project. Pursuant to the Commercial Activities "CA" program established by OMB Circular A–76, the Army is required to solicit bids for these services from the commercial sector to determine whether private sources are more efficient than government. To date, the Army has assessed CA operation and maintenance costs for each type of equipment considered in isolation. It has recently decided to explore the economies of scale and elimination of redundancy that might obtain from combining the CA operation and maintenance responsibility for all electronic and related equipment in a single management entity. To this end it has established the Information Mission Area ("IMA") program to study the advantages of issuing a single solicitation for such services. The IMA program is part of the Army's larger plan for a consolidated information system, articulated in its Information Management Program.[1] The Fort Drum project will ac-

---

1. *See* Army Regulation 25–1, "The Army Information Management Program" (issued March 31, 1986), at 5–6 and Army Regulation 25–5, "Information Management for the Sustaining

cept the IMA program as developed and will serve as a model for future similar projects. Operation and maintenance responsibilities will be combined for developing the Fort's Information System Facility.[2]

On March 22, 1986, the Army issued solicitation number DACA51–86–R–0015, inviting submission of bids for the installation of telecommunications equipment and a FM fire alarm system for Fort Drum. This solicitation announced an intent to purchase the telecommunications equipment involved.[3] Plaintiff, the Bell Operating Company providing local telephone service in New York, challenged this determination in a bid protest filed with the General Accounting Office (GAO) on April 3, 1986. Stating that it wished to provide the needed equipment but that under its tariff regulations it could do so only if the Army would accept a lease and allow it to maintain the equipment, it asserted that the Army's failure to consider a lease-maintenance arrangement violates certain procurement statutes and regulations designed to promote competition. The parties entered into negotiations during which plaintiff, on the Army's request, withdrew its GAO protest to facilitate informal settlement, but none eventuated.

During the negotiations, the Army conducted a comprehensive review of the legal strictures governing the solicitation and of the requirements for the Fort Drum facilities.[4] It concluded that the proposed lease arrangement would directly conflict with the IMA program's objective of combining operation and maintenance responsibilities under single central management. It was also concerned that amendment would delay the high-priority September 1987 stationing date.[5] Accordingly, it decided not to amend the Fort Drum solicitation.[6]

**Standing**

 The Army argues that plaintiff lacks standing. Plaintiff has standing to challenge the Army's allegedly anticompetitive solicitation plan if it establishes: 1) that it has suffered injury in fact; 2) that the injury is one arguably within the zone of interests protected by the applicable statutes and regulations; and 3) that the statutes in question do not reflect a clear and convincing intent to preclude review. *See, e.g., Gull Airborne Instruments, Inc. v. Weinberger*, 694 F.2d 838, 841 (D.C.Cir. 1982); *Control Data Corp. v. Baldrige*, 655 F.2d 283, 288–89 (D.C.Cir.1981), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981); *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 861–73

---

Base" (issued March 1, 1986), at 10–11, filed September 16, 1986.

The Program aims at establishing "a management structure, methodology, and concept of operation ... ensur[ing] the integration, standardization, interoperability, timeliness, and validity of information provided to Army decisionmakers and used to execute the functions and responsibilities of the Army in peace, transition to conflict, and conflict." It constitutes "the management tool to ensure that appropriate, timely, and accurate information for decision is identified, directed, communicated, and resourced in order to execute Army responsibilities." Army Regulation 25–1 at 6.

2. *See* Declaration of Robert J. Stohlman, at ¶ 4; Letter from J.R. Sculley to Togo West (Aug. 12, 1986), Attachment 3 to Stohlman Declaration, at 2.

3. Solicitations for the remainder of the electronic equipment, as well as for the operation and maintenance services required for all equipment, are scheduled to be issued later in the year.

4. *See* Stohlman Declaration at ¶¶ 3–4; Tr. at 39–41.

5. *See* Stohlman Declaration at ¶¶ 5–6 and Attachment 1, Tab V; Sculley Letter at 2. *See also* Affidavit of Samuel C. Emerson, at ¶¶ 4–7.

6. *See* Stohlman Declaration at ¶ 4; Tr. at 32–34. Prior to this decision the Army extended the deadline for submission of bids from May 31, 1986 to July 15, 1986 and finally to August 15, 1986. Plaintiff resubmitted its bid protest with the GAO on August 8, 1986, but did not bid. On August 13, 1986 the Army formally refused to change the solicitation terms, and on August 15, 1986 plaintiff instituted this action. On that date another judge of this Court denied plaintiff's application for a temporary restraining order. Following the September 10, 1986 argument on the preliminary injunction motion, the Court advised the GAO that it would resolve the issues directly without referral to it for a prior ruling.

(D.C.Cir.1970). Plaintiff has satisfied this test.

Injury in fact is plainly present. Plaintiff is fully qualified to provide the needed equipment.[7] It is precluded from bidding on the solicitation: the Army wishes only to buy equipment, and applicable tariff regulations require plaintiff to lease and maintain any equipment it provides.[8] If the Army is forced to accept lease-maintenance bids for the solicitation, plaintiff will be allowed to bid and its injury will be fully redressed. *See Control Data, supra,* at 289; *Rubber Millers, Inc. v. United States,* 596 F.Supp. 210, 212 (D.D.C.1984). The right to bid for a government contract is an important one, *see, e.g., Choctaw Manufacturing Co. v. United States,* 761 F.2d 609, 616 (11th Cir.1985); *General Electric Co. v. Seamans,* 340 F.Supp. 636 (D.D.C.1972) —certainly more substantial than the "identifiable trifle" sufficient for standing. *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 714 (D.C.Cir.1977). Plaintiff's alleged injury also falls within the protection of the statutes and regulations it suggests are applicable. The requirements they impose are designed to promote participation of available bidders in procurement. The Army concedes plaintiff meets the third condition in that the statutes involved suggest no intent to preclude judicial review.[9]

**Applicable Law**

■ Plaintiff submits three arguments for invalidating the Army's solicitation. First, it argues that the solicitation violates the Armed Services Procurement Act of 1949, as revised ("ASPA"), 10 U.S.C.A. §§ 2301 *et seq.* (1983 & Supp.1986), and subordinate requirements of the Federal Acquisition Regulation ("FAR"), 48 C.F.R. Chapter 1 (1985). Second, it argues that the solicitation violates established Department of Defense ("DoD") policy requiring the Army to consider to the maximum extent possible all offerors of telecommunications resources. Finally, it argues that the plan violates requirements for telecommunications procurement imposed by the Federal Information Resources Management Regulation ("FIRMR"), 41 C.F.R. Part 201 (1985). This Court, in reviewing the Army's decision, "is limited to determining whether the agency acted in accord with applicable statutes and regulations and had a rational basis for its decisions." *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984); *see also M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971).

The ASPA, substantially revised in 1984 by the Competition in Contracting Act, sets the general requirements for military procurement. In prescribing competition requirements for procurement contracts it mandates "full and open competition through the use of competitive procedures" and "use [of] the competitive procedure or combination of procedures that is best suited under the circumstances of the procurement." 10 U.S.C.A. § 2304(a)(1) (Supp. 1986). In setting procedures for carrying out solicitations, it requires each military agency to "specify the agency's needs and

---

**7.** *See* Declaration of William G. McGruther, at ¶¶ 3–8.

**8.** *See* Affidavit of William A. Gillard, Jr., at ¶¶ 3–4.

**9.** Given the peculiar aspects of this situation the Court need not address whether in general, to establish standing, a company attacking the terms of a solicitation must first submit a bid. Here, the obvious ability and desire of plaintiff to participate in this procurement—evidenced by how seriously the Army considered its proposals over a number of months—considered in light of the absolute legal bar to effective bidding participation imposed by plaintiff's tariff regulations, are enough to establish plaintiff's legal interest in challenging the solicitation.

Both parties take the position that jurisdiction is proper here rather than in the U.S. Claims Court. That court has held it possesses jurisdiction under the applicable provision of the Federal Courts Improvement Act, 28 U.S.C. § 1491(a)(3) (Supp.1986), only where a responsive bid has been submitted. *See, e.g., Omega World Travel, Inc. v. United States,* 9 Cl.Ct. 623, 627–28 (1986) (reproduced as Exhibit B to Plaintiff's Memorandum); *Olympia USA, Inc. v. United States,* 6 Cl.Ct. 550, 552 (1984); *Hero, Inc. v. United States,* 3 Cl.Ct. 413, (1983). *See also Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 376 (1983) ("[b]ecause the obligation to follow procurement regulations is statutory and not contractual, this court has no jurisdiction under section 1491(a)(3) to correct alleged errors in the bid invitation itself").

solicit bids or proposals in a manner designed to achieve full and open competition for the procurement" and "to develop specifications in such manner as is necessary to obtain full and open competition with due regard to the nature of the property or services to be acquired," *id.,* § 2305(a)(1)(A).[10]

The FAR was promulgated pursuant to the Office of Federal Procurement Policy Act ("OFPPA"), 41 U.S.C.A. §§ 401 *et seq.* (Supp.1986), to apply to all federal agencies. *See* 41 U.S.C.A. § 405a (Supp.1986). It requires " '[f]ull and open competition' " in procurement and directs that "all responsible sources [be] permitted to compete." 48 C.F.R. § 6.003 (1985). It also requires agencies to "consider whether to lease or purchase equipment based on a case-by-case evaluation of comparative costs and other factors," such as the rental and purchase prices involved, contemplated length of use, maintenance and services costs, and other factors. 48 C.F.R. § 7.401(a) (1985).

■ The Army has complied with the ASPA and the FAR, and its solicitation plan is eminently rational. Pursuant to its IMA program, the Army has decided that it is necessary to consolidate operation and maintenance of its electronics ·equipment. Plaintiff has not alleged that this is an unreasonable or irrational goal. The FAR does not restrict the Army's right to make this initial determination of its needs.[11] To implement its IMA program the Army must purchase the equipment, or at minimum, lease equipment from a company that will not insist on performing maintenance. The Army's solicitation plan is fully competitive, open to all bidders able to meet the Army's reasonable needs. Plaintiff is unable to meet them.[12] To accommodate plaintiff the Army would be forced to issue simultaneous solicitations for all its electronics equipment *and* operation and maintenance services, and could finalize the configuration of its electronics system only *after* evaluation of bids. The ASPA and FAR do not require an agency to alter its underlying procurement objectives in this manner; the Army is not obliged to sacrifice the objectives of its IMA program to accommodate plaintiff.

Even if the FAR applied to the Army's initial decision to implement its IMA program, the solicitation would meet the FAR requirements. In determining to proceed with its IMA program, the Army took account of a 1982 study, updated in 1985, indicating that purchase of telecommunications facilities is generally less costly than lease.[13] Plaintiff argues that the Army's reference to this study indicates that it failed to perform a case-by-case analysis as required by the FAR, and instead simply chose to purchase rather than consider a lease. It also suggests that reliance on this cost information is irrational, given recent changes in market conditions prompted by the breakup of AT & T affecting plaintiff's competitive ability.[14]

These attacks are unfounded. The Army has made a case-by-case analysis of the Fort Drum project of which this solicitation

---

10. The ASPA also declares more generally the national interest that procurement be accomplished "in the most timely, economic, and efficient manner" and prescribes that procurement shall "promote full and open competition" although it must also "be implemented to support the requirements of [military] agencies in time of war or national emergency as well as in peacetime," *id.,* §§ 2301(a), 2301(b)(1) & (2).

11. *See* 48 C.F.R. § 2.101 (1985) (applicability of the FAR *"begins* at the point when agency needs are established") (emphasis added). *Compare* 47 FR 8385 (1982) (scope of FIRMR, see discussion *infra* pp. 23–25, "is broader than [that of] the FAR, and includes requirements of determination and use").

12. For the purposes of *this* solicitation, therefore, plaintiff cannot be considered a "responsible source" entitled to compete under 48 C.F.R. § 6.003 (1985), however competent it may be in the area generally and regardless of how much respect the government may have for its ability, *see* Tr. at 17–18.

13. The study was part of the Army's "CONUS Base Communications Modernization Master Plan (Telephone System)," a plan for systematic capital investment in equipment to improve the Army's telephone service, intended to mesh with the Army's other plans to improve its communications system. *See* Stohlman Declaration at ¶ 6 and Attachment 1, Tabs G, V.

14. See Plaintiff's Memorandum at 16.

is a part. It has considered its requirements in light of relevant cost data and "other factors"—particularly its need to implement the IMA program. It has not prejudgmentally ruled out appropriate lease proposals. Indeed, it appears quite willing to consider them.[15] After careful analysis it has simply concluded that any cost savings possible from opening its Fort Drum solicitation to plaintiff would be outweighed by the system-wide benefits of its IMA program.[16] Although the Army has conducted no formal quantified study proving this analysis, its conclusion cannot be attacked as irrational. Both the Army's previous general cost study and the FAR itself, which advises preference of acquisition over long-term lease, *see* 48 C.F.R. § 7.402(b)(3) (1985), suggest that the cost savings of leasing, if any, would likely be minimal. Plaintiff has not demonstrated otherwise, nor has it explained why a formal study of cost savings is mandated by the ASPA or FAR, especially at this initial stage in the IMA program—during which the Fort Drum procurement will itself be a model for future projects. The Army cannot be required to place its IMA program on indefinite hold merely on the hope that leasing economies would be so massive as to outweigh the IMA economies contemplated for the project as a whole.

██ In its second attack, plaintiff argues that the Fort Drum solicitation plan violates DoD policy and DoD findings recommending consideration of all procurement options, citing the DoD Inspector General's "Report on the Audit of Base Communications," dated May 11, 1984 (reproduced as Appendix B to Plaintiff's Reply Memorandum). That report reviewed a DoD policy established in 1978 requiring that telecommunications systems "be competed to the maximum extent possible" and that the military consider any "source that can satisfy requirements for base telephone systems." The report addressed concerns that the Army, by failing to consider non-pur-

chase alternatives, was violating this policy and thus failing to "achieve the full economic benefits of competition and deregulation." *Id.* at 22. It recommended that the Army "solicit proposals that include all acquisition options ... in future acquisitions of telephone systems." *Id.* at 24. As the previous discussion indicates, the Army is receptive to bids from any source that can provide the needed equipment without impairing its IMA program, and it therefore has complied with this policy.

Finally, plaintiff urges that the Army's solicitation plan violates the strictures of the FIRMR. The FIRMR requires that "[w]here applicable, requirements shall be set forth in a manner that will permit all responsible tariff and nontariff suppliers to submit offers." 41 C.F.R. § 201–38.012(a) (1985). It also mandates that

[t]he method of contracting for telecommunications requirements shall be determined after consideration of the relative merits of the alternative methods available; i.e., purchase, lease, or lease-with-option-to-purchase. A comparative cost analysis of the alternative methods shall be performed to determine which method provides the Government with the lowest overall cost over the total systems life....

41 C.F.R. § 201–40.006 (1985).

██ Plaintiff argues, on the authority of *In re Chesapeake and Potomac Telephone Co.*, No. B–220512.2, slip op. (Comp.Gen. March 7, 1986) (reproduced as Appendix C to Plaintiff's Memorandum), that under the FIRMR the Army cannot select its telecommunications equipment based on pre-solicitation cost studies—that it must instead compare "alternative proposals actually received in competition, particularly when the effect of imposing the purchase requirement is to exclude the local telephone company without affording it an opportunity to present its best pricing." Slip op. at 3. The circumstances of the Fort Drum solici-

**15.** In negotiations with plaintiff the Army made clear that its was unable to accomodate plaintiff's wish to submit a bid primarily because it "was intending to propose a tariff arrangement and was not planning to propose either a lease,

purchase, lease with option to purchase, or lease to purchase...." Stohlman Affidavit at ¶ 4.

**16.** *See* Tr. at 34–35; Stohlman Affidavit at ¶ 4.

tation plan suggest that the FIRMR has little to say about this situation. As noted above, the Army has not ruled out lease proposals on cost grounds; it has merely refused to consider any proposals which conflict with its needs under the IMA program. Moreover, to the extent a comparative cost analysis is required, the Army's review to date suffices.

■ But it is unnecessary to decide whether the terms of the FIRMR might require the Army to accommodate plaintiff by permitting it nonetheless to bid, because the FIRMR does not apply to telecommunications procurements involving the Army. 41 C.F.R. § 20–1.102(a) (1985) states that the FIRMR was "prepared, issued, and maintained, and the FIRMR system is prescribed, by the [General Services Administration ('GSA')] under the Federal Property and Administrative Services Act of 1949" ("Property Act"), 41 U.S.C.A. § 251 et seq. (1986). This statute does not apply to the Army. *See* S.Rep. No. 50, 98th Cong., 2d Sess. 1–2, reprinted in 1984 U.S. Code & Ad.News 2174 ("Two statutes provide the foundation for federal contracting. The [ASPA] applies to the [DoD].... The [Property Act] directs the purchasing activities of civil agencies").

Plaintiff contends, however, that "the [Property Act] is not the only statutory basis for the FIRMR." [17] It argues that the FIRMR is actually incorporated by reference as Part 39 of the FAR. Its argument is based mainly on the language of Part 39, which states simply that the FIRMR "contains policies, procedures, and guidelines peculiar to automatic data processing (ADP), telecommunications, and related resources. Contracting for [these resources] shall be accomplished in accordance with agency supplements and other FAR parts when applicable." In support of this interpretation, it cites an agreement between the GSA and the Administrator in charge of the FAR, describing the proposed use of the FAR for publication of regulations relating to these areas. *See* 47 FR 8384 (1982). It argues that the Administrator delegated to the GSA sole responsi-

bility for developing these specialized regulations that would then apply government-wide through the FAR.

This interpretation is rejected. The Administrator did not delegate any power to the GSA. The agreement merely indicates the Administrator's respect for the existing, exclusive jurisdiction of the GSA over this subject area, recognized explicitly by Congress. In a 1978 amendment to the OFPPA, the statute creating the Administrator's powers over the FAR, Congress stated that nothing in the OFPPA can be read to "impair or affect the authorities or responsibilities conferred by the [Property Act] with respect to the procurement of automatic data processing and telecommunications equipment and services or of real property...." 41 U.S.C.A. § 405(h)(1) (Supp.1986). The agreement was purely one of convenience, "to use the FAR system as a publication vehicle" for the FIRMR regulations. 47 FR 8384 (1982).

Plaintiff has offered no contrary proof that the regulatory agencies involved intended the FIRMR to apply to agencies not subject to the GSA's jurisdiction (or even that such an intent could be permissible statutorily). The agreement indicated the opposite intent. It noted the differences in intrusiveness between the two sets of regulations, pointing out that the FAR regulations, which apply to all agencies including the military, "begin at the point when agency needs are established" and that the GSA's coverage in FIRMR "is broader ... and includes requirements determination and use...." *Id.* at 8385. It thus decided that the "GSA will develop a modification to Part 1 of the FAR to recognize two aspects of Part 39 that are unique from other portions of the FAR," thus reflecting the differences in the "statutory basis for GSA authorities and responsibilities" for the FIRMR as compared with the other FAR regulations, and "the sole responsibility of the GSA" for maintaining the FIRMR regulations. *Id.* Thus, Part 39 of the FAR does not incorporate by reference the FIRMR; its present language merely refers the reader to specialized regulations of possible applicability to certain agencies.

**17.** Plaintiff's Reply Memorandum at 20.

Indeed, the FIRMR makes clear that it applies to the military *only* where the GSA happens to be supervising a procurement in cooperation with the DoD. It states that "[t]he applicability of the telecommunications resources provisions of the FIRMR to the Department of Defense (DoD) is governed by the statement of areas of understanding ["SAU"] between DoD and GSA (15 FR 8226, December 1, 1950)." 41 C.F.R. § 201–1.103(c)(3) (1985). The SAU provides that procurement for all such resources will be conducted by the DoD except in limited circumstances where "[c]lose coordination and cooperation" between the GSA and the DoD, through GSA procurement of the resources, may help "obtain the maximum economy consistent with the requirements for service." [18] 15 FR 8226 (1950).

In accord with the above findings of fact and conclusions of law, plaintiff's motion for a preliminary injunction is denied. Defendants' motion to dismiss is granted and the complaint is dismissed. An appropriate Order is filed herewith.

**18.** GSA management is allowable in two cases. SAU ¶ 2(d) provides that the GSA will handle procurement for DoD activities "occupying property controlled or operated by another Federal agency," unless the DoD determines that military needs require otherwise. SAU ¶ 2(e) provides that communication resources will be provided by the GSA "in localities within an area where these services are or may become available under a [GSA] contract when such a procedure is of benefit to the Government as a whole and does not adversely affect Military operations, exercise of command and/or National security." 15 FR 8226 (1950).